Wiluams, Judge,
delivered the opinion;
On April 30,1930, we made special findings of fact in this case and entered a judgment in favor of the plaintiff for $16,503.40.
A new trial was granted on the motion of the plaintiff on November 30, 1930, and an order entered setting aside the former findings of fact, judgment, and opinion, with leave to the respective parties to introduce such further evidence as they might deem advisable.
Neither the plaintiff nor the defendant submitted any additional evidence and the case now comes on for decision on the evidence originally taken and considered at the former hearing. While neither of the parties has submitted further evidence, we have been aided in the reconsideration of the case by able briefs and oral arguments of counsel for the respective parties.
Numerous exceptions have been taken to the special findings of fact heretofore made, and additional findings suggested.
The case arises out of a contract dated November 13,1919, entered into between the plaintiff and the defendant under the act of Congress of July 1, 1918, 40 Stat. 725, for the development of a submarine base at Key West, Florida. The act contained the following provisions:
“Naval station, Key West, Florida: Station improvements, $25,000; for the development of a submarine base, $1,000,000: Provided, That the Secretary of the Navy is *340 authorized to enter into contracts or otherwise to gations for this purpose not to exceed $1,500,000 in addition to the appropriations herein made; in all, $1,025,000.”
Under the contract the plaintiff agreed to furnish all labor and materials necessary to construct, and to construct and complete certain water-front improvements in accordance with the provisions of the contract and the plans and specifications incorporated therein.
The contract price of the work exclusive of dredging, filling, and grading was fixed at $751,730.00. The estimated cost of dredging, filling, and grading, at unit prices stipulated in the contract, was $954,000.00, making a total estimated contract price for the work of $1,705,730.00.
The plaintiff began the work shortly after the execution of the contract. .The work was finally completed and accepted on July 25, 1922.
Upon completion of the contract there was a difference of opinion between the plaintiff and the defendant as to the amount due under the contract, and on August 1, 1922, the defendant paid over to the plaintiff the sum of $162,322.55. There was admittedly due to the plaintiff at that time the sum of $165,522.55, but as a condition of the partial settlement the defendant withheld from the plaintiff 2% of the amount admitted to be due, amounting to $3,200. The plaintiff sues to recover this $3,200 so withheld. The plaintiff is clearly entitled to a judgment. The amount was withheld without authority of' law and is due to the plaintiff. McClintic-Marshall Co. v. United States, 59 C. Cls. 817.
In addition to the $3,200 so withheld, the plaintiff sues to recover upon two other items. The first item is the sum of $13,303.40 for a balance claimed to be due on marl furnished upon the work.
When settlement was made on August 1,1922, the plaintiff was paid for the furnishing of 37,079 cubic yards of marl. The plaintiff contends that it should have been paid upon the basis of'49,173 cubic yards, a difference of 12,094 cubic yards. The unit price for marl furnished under the contract was $1.10 per yard.
The question presented upon this branch of the case is one of interpretation of the provisions of the contract covering *341 this part of the work. Paragraph 53, of the specifications, provides:
“ It is the intention of the Government- to have that part of breakwater fill indicated as marl on drawings consist of the soft material dredged from basin with at least 2 feet of pure marl on top.
“It is assumed that sufficient marl or equivalent, satisfactory to the officer in charge, will be found in the basin and each bidder shall base his proposal upon that assumption.
“ Each bidder, however, shall also submit a unit price bid, as per item 4 (c), for furnishing and depositing marl in such quantity as may be needed, if any, over and above the material, satisfactory to the officer in charge, excavated from basin.”
Item 4 of paragraph 206 of the specifications provides:
“(a) Unit price for each cubic yard of rock material (measured in original position) excavated and deposited as specified.
“(b) Unit price for each cubic yard of soft material (measured in original position) excavated and deposited as specified.
“(c) Unit price for each cubic yard of marl furnished and placed by dredging contractor in case sufficient marl or its equivalent, satisfactory to the officer in charge, is not available from basin.”
Paragraph 6 of the contract provides:
“ For each cubic yard of rock material excavated and deposited in accordance with item 4 (a), the sum of two dollars and fifteen cents ($2.15);
“For each cubic yard of soft material excavated and deposited in accordance with item 4 (b), the sum of fifty cents ($0.50);
“ For each cubic yard of marl furnished and deposited in accordance with item 4 (c), the sum of one dollar and ten cents ($1.10).”
It will be noted that materials excavated and deposited under items 4 (a) and 4 (b) are to be “ measured in original position.” The clause, “ measured in original position,” is omitted from item 4 (c), clearly indicating that marl furnished and placed under this item was not to be “ measured in original position,” but was to be paid for on the basis of some other measurement. We think the necessary conclusion is that the marl was to be measured in place after it had *342 gone into the fill. None of the marl was excavated from the basin, but it was all procured by plaintiff and brought in from other places. It was measured after it had been placed on the fill and the plaintiff was paid for the marl on the basis of that measurement. The plaintiff’s contention is that this method of measurement was not in accordance with the provisions of the contract. Plaintiff’s position on this item of the claim is set forth in its statement to the Navy board, referred to in our findings of fact:
“ Measurement of marl: Paragraph 56 of the specifications as a part of the contract provided that ‘ material to be dredged or excavated shall be measured in its original position.’ Notwithstanding, the department elected to measure marl only in its final position after having dried out.”
The plaintiff’s construction of these contract provisions can not be sustained. It is clear that only such materials as were excavated from the basin were to be measured in original position. Measurement of the marl brought in from the outside in final position on the fill was in accordance with the provisions of the contract.
It appears, however, that without fault on the part of the plaintiff, 2,068 cubic yards of marl placed by the plaintiff was washed away before the outer bulkhead provided in supplemental agreement 3762-Z, hereinafter referred to, was completed. Subsequently the plaintiff was compelled to and did replace the marl so washed away. For this replacement no credit was allowed by the defendant in the settlement. The plaintiff is entitled to recover the contract price for the marl, $2,274.80, so washed away and replaced.
The second additional claim of the plaintiff is for damages growing out of delay in completing the contract. The contract was to be completed within 500 calendar days after the delivery of the contract to plaintiff. It was completed and accepted 970 days after delivery of the contract, 470 days after the date of completion specified in the contract. On May 27, 1921, during the progress of the work, the Bureau of Yards and Docks of the Navy Department granted to the plaintiff an extension of time of 50 days because of fires and strikes, leaving 420 days delay in the completion of the work beyond the time stipulated in the contract as so extended.
*343 By reason of this delay the plaintiff incurred additional costs and expenses (Finding XVII) amounting to $83,918.05, which amount it seeks to recover, alleging that the delay was caused by-acts of the Government, through its officers having charge of the work.
The questions are: (1) Was the Government responsible for all or any part of this 420 days’ delay in the completion of the contract, and (2) if the Government was responsible for any part of the delay, then for what part, and (3) if such delay, or any part of it, was caused by the Government, was the delay of such character as to entitle the plaintiff to recover the damages caused thereby?
If it be held that the Government was responsible for any part of the delay, and if the part of the delay so caused by the Government is proven, and by the evidence segregated out from the delay caused by other sources, so that it could be determined that the Government was responsible for a certain, specific, ascertained part of the delay, and, if the delay, so proven, was of such character as to entitle the plaintiff to recover therefor, the plaintiff is entitled to a judgment for the amount of the damages resulting therefrom.
While a substantial part of the delay has been shown to have been caused by the Government, the part so caused has not been established by any degree of certainty, and only by resorting to speculation and conjecture can the amount of the plaintiff’s damages, fairly attributable to the delays caused by the Government, be arrived at. Furthermore, we are of the opinion that the delay upon the part of the Government, under the circumstance, was not of such a character as to entitle the plaintiff to recovery.
The delay in the completion of the contract was the result of three causes. In the first place, storms, bad weather, and numerous breakdowns in the equipment used on the work contributed in a substantial way to the slowing down of the progress of the work. It is not possible to determine from the record that the final completion of the contract was delayed any certain number of days from these causes. At no time was the work wholly shutdown or discontinued for any substantial time on account of weather or breakdowns, but there can be no doubt that, from first to last, *344 these causes accounted for a very considerable portion of the delay. For such delays the defendant, of course, is not liable.
A greater portion, but a portion likewise impossible of exact and definite computation, arose out of the fact that from time to time the officers of the defendant made various changes in the plans and specifications of the work. A considerable amount of work was required of the contractor over the work specified by the contract as originally drawn. The plaintiff has been paid for the additional work so performed. As to the delay so caused, it is asserted by the defendant that the plaintiff has been paid in and as a part of the additional compensation paid to it for the performance of the additional work, and that under the law the plaintiff is not entitled to recover anything in addition for the delay resulting from such changes. It is contended by the plaintiff that the delays were of such nature and the changes in the plans so extensive and comprehensive as to establish the fact that the original plans were wholly ineffective, impractical, and insufficient, and that the work was held up and retarded by the defendant until new and radically altered plans were adopted and approved. It is claimed that when it became apparent that the plans were unworkable, the officer in charge of the work required the contractor to slow down the schedule of work, and that the plaintiff, for this reason, incurred additional expenses, and that he was thereby damaged.
Principally, but likewise for a period of time impossible of definite ascertainment from the record, the work was delayed because the plaintiff, with the knowledge and consent but not under the direction of the responsible officers of the United States, adopted a schedule of progress sufficiently retarded to keep the work performed within the limits of the moneys appropriated by Congress for the payment of the work. The act of Congress under which the contract in question was let made an appropriation of $1,000,000 for the work and authorized the Secretary of the Navy to enter into contracts or otherwise to incur obligations in addition thereto not to exceed $1,500,000. By the contract in question the Secretary of the Navy contracted for work to cost in excess of the $1,000,000 appropriated by *345 the act and within the limitation imposed by the act of an additional $1,500,000, the total contract price contracted being between $1,700,000 and $1,800,000. The money for the work other than the original $1,000,000 was not appropriated by the Congress until July 12, 1922, on which date an additional appropriation of $800,000, approximately the amount needed to complete the work, was made.
After the contract was executed, the plaintiff so arranged the progress of the work as to stay within the $1,000,000 appropriated by Congress. There was some delay in the appropriation by Congress of moneys other than the original $1,000,000; and the plaintiff, instead of pushing the work onward to completion as rapidly as it might have done, purposely and deliberately adopted a slower schedule in order that the appropriation might not be exhausted. At no time was the plaintiff compelled to, nor did it, suspend the work in its entirety; but there can be no doubt that, had more funds been available for application upon the contract, the plaintiff could and would have proceeded with the work more rapidly and completed the contract within a shorter time and as a result at less cost to it.
The action of the plaintiff in keeping the completed work within the limit of the available appropriation was known to and approved by the officers of the defendant in charge of the work, but at no time was the plaintiff directed or ordered to slow down the work or to retard its progress on the contract. Both parties concurred in the course of action, and the situation is made clear by reference to an exchange of letters upon the subject matter between the plaintiff and Admiral Parks, Chief of the Bureau of Yards and Docks of the Navy Department. During 1920 the plaintiff from time to time urged upon the department the necessity of securing adequate funds so that the work could be completed within the contract time. On May 8, 1920, the Bureau of Yards and Docks of the Navy Department advised the plaintiff by letter that it expected to secure additional funds from Congress at the next session (to convene in December, 1920). By September, 1920, it was apparent that to keep up with the progress of the contract as outlined by the plaintiff for completion of the work within *346 the required time, an additional more powerful dredge on the work would be necessary.
On or about September 13 or 14, a representative of plaintiff advised Admiral Parks of this situation and of the necessity of putting the second dredge on the work in order to complete it in contract time and that it was important to have assurance that additional funds would be available, because the second dredge would have doubled the capacity of the dredge then working and would soon consume all available funds. This statement plaintiff confirmed by letter to Admiral Parks dated September 15, 1920. Admiral Parks had stated that he had been unable to get any assurance from Congress that the balance of the funds would be immediately available and stated to the contractor that he would be just as well satisfied if the additional dredge was not sent at that time.
Plaintiff received no answer to its letter of September 15, 1920, and received no definite instructions from the Navy Department as to what it should do or as to when the additional funds would be available. Early in January, 1921, the plaintiff contracted with the Bowers Southern Dredging Company to send the additional dredge to Key West, and by letter of January 25, 1921, so notified the Navy Department, at the same time asking for information as to additional funds.
On January 27, 1921, the Navy Department by letter of Admiral Parks acknowledged receipt of the communication of January 25, 1921, and stated that “the bureau would be as well satisfied if the dredge were not transferred to that job at this time, as the question of funds will probably not be settled before the end of this session.”
The plaintiff thereupon directed the Bowers Southern Dredging Company not to bring the additional dredge contracted for on from Miami, and it was not put on the work.
The attitude of the parties as reflected by this incident is fairly illustrative of their position on this matter. Under the circumstances, and in view of the fact heretofore pointed out, that ascertainment with any degree of certainty the amount of time the plaintiff was actually delayed by this course of conduct, we are of the opinion that the plaintiff *347 can not recover for the delay so caused, whatever it may have been. We are confirmed in this view by the attitude of the parties at the time of the making of supplemental agreement No. 3762-Z, on February 18, 1922, hereafter referred to, and also by the legal effect of that instrument.
Aside from the contention of the defendant that under no circumstances can the United States be held liable for delays consequent upon the failure of Congress to make the appropriation, it being argued that, this is an act of the United States in its sovereign and not in its contractual capacity (Sanger & Moody v. United States, 40 C. Cls. 47; Horowitz v. United States, 267 U. S. 458) the delay was not caused by the defendant alone, but was caused by the acts of and concurred in by both of the parties. In such a case neither party can complain of the delay nor hold the other liable in damages therefor. Greenfield Tap & Die Corp. v. United States, 68 C. Cls. 61; Standard Steel Car Co. v. United States, 67 C. Cls. 445; Caldwell da Drake v. Schmulbach, 175 Fed. 429; Jefferson Hotel Co. v. Brumbaugh, 168 Fed. 867.
The plaintiff in support of its contention that the Government is liable in damages for the failure of Congress to make timely appropriations calls attention to the rule that in building and construction contracts, calling for the performance of labor and the furnishing of materials covering a long period of time and involving large expenditures, a stipulation for payments on account to be made from time to time during the progress of the work, must be deemed so material that a substantial failure to pay would justify the contractor in declining to proceed. Guerini Stone Co. v. Carlin Construction Co., 248 U. S. 334; see also on this point, Overstreet v. United States, 55 C. Cls. 154. While the rule there (in the Guerini ease) announced arose between private parties and the United States was not a party, nor the question of the liability of the United States in similar circumstances, before the court, the rule announced would apply under like circumstances in full measure to the United States.
Without going to an undue length into a detailed analysis of the facts before the Supreme Court, it is sufficient to point *348 out that the situation in the Guerini Stone Go. ease differed from the instant case among other particulars, in this, that in the case here the defendant at no time defaulted in meeting any payment due to the plaintiff for work done under the contract. At no time was the work shut down for lack of funds; at no time was the defendant in default in the payment to the plaintiff for any work performed. It is not necessary to consider what might have been the situation had the plaintiff proceeded to perform the work as rapidly as possible and thereby performed work beyond the amount of the appropriation, as that situation at no time arose. Clearly the plaintiff had the right to perform all the work contracted for whether appropriations to pay for all the work done were available or not. It did not, however, elect to do so, but rather, chose to keep within the funds available to pay for the work. The plaintiff can not contend that the defendant is liable for damages arising out of a course of conduct to which it consented and in which it had a part.
This construction is consistent with the conduct of the parties at 'the time of the execution of the supplemental agreement above mentioned.
The contention of the plaintiff that it is entitled to recover for the delays caused by the changes in plans, is not consistent with the supplemental agreement mentioned. By section 11 of the general provisions of the contract for this work, the Government had reserved the right to make “ such changes in the contract, plans, and specifications as may be deemed necessary.” After the work was started, certain changes were ordered by the Government. The more important of these changes had to do with the design and construction of the breakwater, necessary to insure its safety and permanency.
The jaroposed changes were first recommended by the public-works officer in charge of the work on January 14, 1920. After some corrections were made, the proposed changes were approved, in substance as recommended by the public-works officer, and were embodied in two supplemental agreements, Supplemental Agreement No. 3762-Y, entered into on *349 September 17, 1921, and Supplemental Agreement No. 3762-Z, entered into February 18, 1922.
The first of these supplemental agreements (No. 3762-Y) had to do with the construction of a timber bulkhead along the seaward side of the breakwater platform; extending from Ft. Taylor to the breakwater crib. The plaintiff has been paid for the stipulated price of this work, and the work done under this supplemental contract is not involved in this suit.
Supplemental Agreement No. 3762-Z provided for the construction complete of a 6" creosoted timber sheet pile bulkhead on a line parallel to and 90 feet seaward of the bulkhead adjoining the timber platform of the breakwater, from Ft. Taylor to the breakwater crib, and the filling of the area between the bulkheads with marl, and the construction and completion on the northerly stretch of the breakwater parallel to the channel of four 10" creosoted timber sheet pile groins extending 30 feet at right angles to the face of the outer bulkhead.
By the terms of supplemental agreement No. 3762-Z, plaintiff received for the work provided therein, additional compensation of $78,541.64.
The provision of the original contract authorizing changes carried with it the reasonable implication that if such changes were made, delay in the prosecution of the work might result.
In Moran Bros. Co. v. United States, 61 C. Cls. 73, the court said (p. 102) :
“ Changes were authorized, and this implied that they would, or at least might, produce delays. The board’s determination settled any compensation due on this account. It was never contemplated * * * by the contract that delays incident to changes would subject the Government to damage beyond that involved in the changes themselves * * *. But the right to make changes was a right expressly contracted for, and if the defendant were made liable for consequential and other damages attributable to delays resulting from changes, the result would be either that the stipulated right to make changes was not effective or that the cost of the vessel might be vastly increased.”
*350 In McCord v. United States, 9 C. Cls. 155, the court said (p. 169) :
“ This privilege of the United States to make alterations on the terms stated being expressly provided for in the contract, the contract price related to that privilege as much as to any other provision in the contract, and therefore it must be taken as included in that price, and paid for in it. And the United States can not be held liable in damages for exercising a privilege they had purchased, but only for abusing it; and the fact is found that they did not abuse it, but made the alterations shown without unreasonable delay.”
Manifestly changes in the plans as to the breakwater embodied in Supplemental Agreement No. 3762-Z delayed the final completion of the contract. It was, however, a delay for which the Government is not responsible in damages to the plaintiff beyond that involved in the changes themselves. The right to make the changes was expressly stipulated in the contract, and in the absence of a showing of unreasonable delay on the part of the Government in making the changes, the United States can not be held liable to the plaintiff for damages incidental to and growing out of the delay occasioned by such changes. Supplemental Agreement No. 3762-Z fixed the plaintiff’s compensation for making the required changes at $78,541.64. This amount had previously been determined as the cost of the changes by a board appointed in accordance with paragraph 17 of the general provisions of the contract. The plaintiff, having contracted to do the work required by the changed plans for this amount, can not recover in addition thereto damages arising from the delay occasioned by such changes.
■ It does not appear the Government abused its reserved privilege by any unreasonable delay in making changes in the plans and specifications of the breakwater. The Navy Department shortly after the contract was entered into decided that the original plans and specifications for the breakwater were inadequate and that certain changes were required to afford safe protection against storms which occur in that locality. The changes in these plans as they were subsequently embodied in Supplemental Agreements 3762-Y and 3762-Z, were substantially agreed upon and *351 determined by the department in January, 1920, before the work of dredging had commenced, and the plaintiff’s engineer was shortly thereafter informed by the public-works officer that such changes had been recommended. The plaintiff’s contention, that the plans for the work were found to be fatally and totally defective, and that the Chief of the Bureau of Yards and Docks by reason thereof ordered the plaintiff to retard the progress of the work resulting in a delay of 420 days, is not supported by the record. The Chief of the Bureau of Yards and Docks at no time ordered the plaintiff to retard the progress of the work on account of defective plans or for any other reason. Although plaintiff had been informed early in 1920 that changes in the plans and specifications for the breakwater had been recommended, it at no time during the progress of the work, prior to November 9, 1921, when placing of marl was ordered to be discontinued pending the decision as to a second bulkhead which had been recommended, made complaint that the progress of the work was being delayed because of defective plans of the breakwater construction. Nor did the plaintiff during that time request an extension of time in which to complete its contract because of delay occasioned by such defective plans, as is required in paragraph 12 of the general provisions forming a part of the contract:
“ * * * Should the contractor at any time consider that he is entitled to an extension of time for any cause, he must submit in writing to the officer in charge an application for such extension, stating therein the cause or causes of the alleged delay. * * * The failure or neglect of the contractor to submit, as above provided, his claim for extension of time within 30 days after the happening of the cause or causes upon which his claim is predicated, shall be deemed and construed as a waiver of all claims and right to an extension of time for the completion of the work on account of the alleged delay. * * * ”
The plaintiff, having failed to notify the contracting officer in writing during the progress of the work of any delay caused by defective plans and specifications for the breakwater, is not entitled to recover damages resulting therefrom, even though such delay be shown. Plumley v. United States, 226 U. S. 545.
*352 The court, in the Plumley case, said:
“ 4. The Government appeals from so much of the judgment as gave Plumley a judgment for damages caused by delay. The court found that Plumley was delayed by the failure to have the architect on hand promptly for decision pertaining to the work, while it also found that the Secretary extended the time for the reason that Plumley’s failure to finish was on account of circumstances beyond the contractor’s control. But Plumley at the time of the occurrence of the delay did not notify the Secretary of the facts nor of the extent to which the work would be delayed. The contract required that such notice should be given to the Secretary when the delay occurred, evidently for the purpose of informing the department and enabling it, at the time, to remove the cause of the delay. It operated to prevent claims for damage and for failure to comply with this requirement of the contract (United States v. Gleason, 175 U. S. 588) ; the plaintiff is not entitled to recover.”
It will be noted that Supplemental Agreement No. 3762-Z did more than specify additional work to be performed and provide for the payment therefor. The mere fact that a supplemental agreement was entered into would not affect the rights of the parties to the original agreement, except as to matters mentioned in the supplemental agreement. But by Supplemental Agreement No. 3762-Z the plaintiff and the defendant modified and amended the original contract in several important respects. By this supplemental agreement the work provided for in the original contract and the additional work made necessary by the various changes ordered by the Government were lumped together and a new contract price agreed upon for the performance of all the work. Instead of the contract price of $751,730.00 specified in the original contract (exclusive of work to be paid for at unit prices), a new contract price, $930,683.31, was agreed upon. And, among the other changes agreed upon, the time within which the contract was to be performed was changed to July 31, 1922.
For all intents and purposes the original contract was supplanted by Agreement No. 3762-Z. The rights of the parties are to be determined by the original agreement, not as originally entered into, but as altered and amended by Agreement No. 3762-Z. The situation is in no wise different than *353 it would have been had the original contract, when originally executed, provided for all the work to be performed for a contract price of $930,683.31 and to be completed on or before July 31, 1922. All the work was performed before July 31, 1922. Most, if not all, the delay complained of took place prior to amendment of the contract in February, 1922. There was not any “ waiver ” of the rights of the plaintiff in the supplemental agreement, or in the mere fact that a supplemental agreement was entered into, as contended by the defendant, but there were a merger of all the rights of the plaintiff under the contract as originally drawn up, into the contract as it stood after the amendment was agreed to. Certainly when so construed there can be no recovery for delay incident to the changes in plans. The plans, as changed, were the subject matter of the contract as amended, and the work specified in the plans as changed has been fully paid for at the contract price.
And, further, we think the whole course of the conduct of both pai'ties at the time the supplemental agreement was signed bears out the view already reached without consideration of this additional circumstance, that the delay in awaiting the appropriation of money by the Congress to complete the work was concurred in by both parties. The supplemental agreement was signed on February 18, 1922. The delay, in the larger part, had already occurred. The parties met on February 18, 1922, and agreed upon a new date for the completion of the contract at a new contract price, making no mention in the contract of other sums due for delays already known to both parties. There is a strong presumption from the failure to provide, by the supplemental contract, compensation for the delay already accrued, that such delay must have been acquiesced in by both the parties to the contract.
On behalf of the plaintiff it is said that the plaintiff complained of the long delay at the time the supplemental agreement was signed; that there was no intention upon the part of the plaintiff to waive any claims for damages due for delay in the execution of the supplemental agreement. These facts, even if true, are not material to the issue. The *354 rights of the parties are to be determined by their agreements and their acts thereunder, unaffected by mental reservations of any kind or even by verbal protests or complaints not carried into and made a part of the contract.
The plaintiff lays much stress on the findings of the Navy board referred to in Finding XIII that the Government was responsible for the entire delay of 420 days in the completion of the contract; that plaintiff’s damages resulting therefrom amounted ’to $83,978.05, and that no damages for the delay were included in the price fixed in the supplemental agreements. It is urged that the board’s findings in respect of these matters are entitled to full credence. Newport Contracting & Eng. Co. v. United States, 57 C. Cls. 581, 586, is cited as supporting the competency of the board’s decision as evidence, and the plaintiff’s contention that full credence should be given to its findings.
The board in the case cited was a board on changes provided for in the contract. Its decisions as to the costs of changes in the plans and specifications under which the work was being performed, when approved by the Chief of the Bureau of Yards and Docks, were binding on both the contractor and the Government. During the progress of the work certain changes were decided upon and a board appointed pursuant to the provisions of the contract determined the costs of such changes. The board’s decision was approved by the Chief of the Bureau of Yards and Docks. Upon settlement for work done under the contract the contractor was not paid the full amount fixed by the board as the costs of the changes. The court held the contractor was entitled to recover for the additional work required by the changes the full amount fixed by the board.
In the instant case the board that passed upon the plaintiff’s claim was not provided for in the contract, and was created and functioned long after the completion of the work. It was an eoa parte tribunal whose findings and recommendations had no binding effect on either the plaintiff or the Government. Its report is not competent proof as to any fact at issue in the case. Heathfield, v. United States, 8 C. Cls. 213; Vance et al. v. United States, 30 C. Cls. *355 252; Rigsbee v. United States, 58 C. Cls. 93. Moreover the board’s ultimate conclusion that the Government was responsible for the entire delay of 420 days is so inconsistent with its specific finding in another part of its report that many delays, impossible of definite ascertainment, arose from causes for which the Government was not responsible (Finding XIII), as to destroy entirely its probative value as evidence, even if competent. In explanation of its failure to take into consideration delays for which the Government was not responsible, in fixing the' causes for the entire delay, the board said:
“ The board does not understand that these delays, which were after all of comparatively minor character and are incidental to the execution of almost any public-works contract, and which ran concurrently with the delays caused by the Government, would modify or reduce the responsibility of the Government in case the Government is actually liable for damages arising out of the two major delays.”
This observation discloses a misapprehension on the part of the board both as to the obvious facts in the case and the law applicable to such facts. The record is replete with evidence showing numerous delays caused by breakdown of the dredges, storms, and bad weather, from the very inception of the work until its finish. These delays were not of minor importance and the Government can not rightly be charged with damages on account of them.
The Government objects to the inclusion of the report of the board in the findings of fact on the ground of its incompetency. We have overruled this objection and the report is made a part of the findings by reference. This is not done because we regard the findings of the board competent evidence as to any issue in the case, but as a part of the history of the case incidental to the controversy between the parties.
The plaintiff has not been entirely consistent in its own contentions made from time to time throughout the progress of this case. At the former trial the plaintiff contended that the primary cause of the delay in the completion of the contract was caused by the failure of Congress to make timely supplemental appropriations for the work, and that no part *356 of the delay was caused by the changes in the plans. The plaintiff then said:
“ Consideration of the entire case shows that the primary cause of the entire delay was the lack of available funds when needed. The completion of this contract was not, as a matter of fact, delayed primarily at all Toy the necessary changes made by the Government, but it was delayed because available funds, as provided by the original appropriation and the contract, were not available, so that these changes could have been incorporated in the original contract, or even at a much later date in supplementary contracts, so that the work could have gone on as anticipated. If funds had been available when needed, the changes would have caused no material delay whatever.” (Italics ours.)
This court in substance sustained the position of the plaintiff upon the issue of fact thus presented, finding as a fact that the delay of 420 days was primarily due to failure of Congress to appropriate for the work as and when the money was needed to keep up the original program, i. e., progress at the rate necessary to complete the project in the original contract time. Having so found upon the facts, the' court decided the issue against the plaintiff upon the grounds; first, that under the authority of Sanger & Moody v. United States, supra, and other cases of like effect, there could be no recovery for damages caused by the failure of Congress to make appropriations, following the rule that the fault of the United States in this particular was a fault in the capacity of the Government as a sovereign, and not as a contractor; second, that by the language of the act making the original appropriation of $1,000,000 the contractor was visited with notice that only $1,000,000 was available for the work and that the balance would not be available until an additional appropriation was made, hence, arguendo, the plaintiff must have contracted with this condition in mind and to have assumed the risk thereof.
After this determination of the issue, the plaintiff filed its motion for a new trial, wherein it changed its contention as to the cause of the delay. In its motion for a new trial the plaintiff said:
“ The court erred in not finding as a matter of fact that the delay in the performance of this contract was caused by the Secretary of the Navy, or his agents, in that the plans pre *357 pared for the work were unsound and defective and that the Secretary of the Navy, through his agents, required delay on the part of the contractor because the plans had not been perfected, but were defective, and because the Secretary, acting through the Bureau of Yards and Docks, was not satisfied, that if completed, the work contemplated could be successfully completed and made permanent.”
The only question of fact submitted by the plaintiff in its motion for a new trial was:
“Was it a fact that after the contract was executed, the Government found that the plans for the work were fatally and totally defective, and that the project as contemplated could not be successfully completed and made permanent, and that by reason thereof, the Chief of the Bureau of Yards and Docks ordered the contractor to retard the progress of the work, resulting in a delay of 420 days, during which period the contractor suffered losses and damage in the amount of $83,978.05 ? ”
It might be said that the evidence promised in the event of a new trial, not having been produced, and the court having found against the contention of the plaintiff as to the issue of fact presented in the motion for a new trial, there was no question fairly before the court for redetermination. But we have not taken this view of the matter. A new trial having been granted we have given careful reconsideration to the entire case and to all the contentions of the parties, whenever and however raised. Upon a review of the whole record we are of the opinion, the plaintiff, on the main issue of the case, its claim for damages growing out of the 420 days’ delay in the completion of the work under the original and supplemental contracts, is not entitled to recover.
Judgment is awarded the plaintiff for $5,474.80, the same being $3,200 deducted from the amount due the plaintiff on settlement, and the sum of $2,274.80 for marl furnished and placed. It is so ordered.
Whaley, Judge; Littleton, Judge; and Geeen, Judge. concur.