Booth, Chief Justice,
delivered the opinion of the court:
The Edward E. Gillen Company is a Wisconsin corporation engaged in contracting for the construction of marine works of improvement, foundations, and other similar heavy structures. On October 27, 1932, the defendant by advertisement solicited bids for the construction of Lock 5 on and adjoining the west bank of the Mississippi Biver near Minneiska, Minnesota.
*363 Plaintiff’s bid was accepted and on December 19, 1932, plaintiff and defendant executed the contract involved in this case. The pertinent facts upon which the issues in the case are to be determined are not in dispute. The suit is for the recovery of damages suffered by the plaintiff because of the failure of the defendant to obtain title to certain parcels of shore lands essential for the construction of the lock.
The plaintiff as agreed received $783,528.17 for furnishing all the material and labor for the performance of the contract. When the advertisement for bids was published the plaintiff was not advised and the advertisement did not state that the defendant had on October 25, 1932, instituted in the United States District Court for the District of Minnesota a suit to condemn the lands needed at the site of the work.
Plaintiff first became aware of the condemnation suit on December 6, 1932. Its bid for the contract having been accepted and bond filed, and having qualified under the terms of the advertisement prior to November 29,1932, plaintiff proceeded to execute the contract at the time being requested by the defendant to secure from the Chicago, Milwaukee, St. Paul and Pacific Railroad, the owners of the lands, permission to enter upon and use the same. The railroad company, defendant in the condemnation suit, at first indicated a qualified consent to plaintiff’s request; subsequently it absolutely declined to permit the plaintiff or defendant to enter upon or use the lands.
The particular features of contract construction which exacted the use of the railroad lands provided for in the specifications were, first, the construction of a cofferdam; second, the construction of an esplanade, i. e., an earth fill of approximately 15,000 cubic yards between the inner guide wall and the bank of the river, the fill to extend to an elevation of 665.
The cofferdam was the first thing to be constructed. This was specified as a “three-sided temporary cofferdam on the western shore of the Mississippi River * * *. The fourth arm * * * was to be the shore of the river.” The fact is not traversed that according to the specifications the plaintiff could not construct the fourth arm of the cofferdam *364 without entering upon and utilizing one of the parcels of land to which the defendant did not have title. Finding 6. The esplanade was situate upon railroad land, and the defendant did not acquire title to either parcel until August 1,1933.
The plaintiff was to complete the work within 365 days after notice to proceed, and notwithstanding the defendant’s lack of title to land involved, and the delay in the determination of its condemnation suit, the defendant on January 6, 1933, notified the plaintiff in writing to proceed with the work.
The plaintiff, in view of the situation confronting both parties to the contract, endeavored to have the defendant gain access to the lands for the location of the wings of the cofferdam and the esplanade; to postpone the date for the commencement of the work until access to the lands could be acquired, and finally to change the specifications for the cofferdam so as to avoid the necessity of entering upon the railroad’s lands. All requests were officially denied by the District Engineer.
The District Engineer placed his refusal to grant the plaintiff any relief upon specification 18, and plaintiff was therefore under the necessity of proceeding as best it could. Finding 16 itemizes plaintiff’s loss. Each item is supported by the record and no testimony appears of record to challenge their accuracy. The plaintiff, however, persisted in its efforts to obtain from the railroad company right to enter upon and use its lands and finally on March 17, 1933, sixty-nine days after the receipt of the order to proceed with the work, obtained a license from the railroad company to use its lands, and approximately 355 days later finished the contract work.
Specification 18 reads as follows:
Geounds. — All land at the site below the elevation of ordinary high water (estimated to be Elev. 653.2) is held subservient to the control of the United States for navigation and may be utilized by the contractor as an agent of the United States. The contractor will be solely responsible for obtaining any additional land which he considers necessary for construction purposes and/or the delivery and storage of materials. The con *365 tractor shall, without expense to the United States and at any time during the progress of work when needed for other purposes, promptly vacate and clean up any part of the Government grounds that have been allotted to or have been in use by him, when directed to do so by the contracting officer. The contractor shall keep the buildings and grounds in use by him at the site of the work in a sanitary condition. Suitable extinguishers or fire fighting apparatus shall be provided for ready use in all buildings erected or in use by the contractor on Government ground.
We think the construction adopted by the District Engineer of specification 18 is definitely erroneous, and the mistaken application he made of the same is clearly demonstrable. Manifestly, all land at the site of the work below the high-water mark of the river was subservient to the control of the United States. The river was a navigable stream, and the site of the lock indispensably exacted the utilization of the land described.
In order to construct the lock according to the adopted plans and specifications the defendant required more land than it laAvfully controlled, and was seeking through the court to obtain title to the same. We are speaking now of land the defendant needed so the lock could be constructed the way it wanted it done. The plaintiff did not possess the right of eminent domain and obviously did not require in its own name titl& to additional lands. The only land the plaintiff needed was storage space for its equipment and transportation of its materials, etc., to the site of the work. The right the plaintiff wanted to acquire was a permissive one, nothing additional.
What space the plaintiff needed, as noted above, was we think the extent and meaning of so much of the provisions of specification 18 as imposed upon it the obligation for obtaining “any additional land * * * necessary for construction purposes and/or the delivery and storage of materials.” The plaintiff’s contract provided expressly for furnishing all the materials, equipment, and labor necessary to construct the lock. No provision of the contract obligated it to acquire the fee simple title to any land essential to the construction of the permanent work.
*366 On January 6, 1933, the defendant was not in a position to order the plaintiff to proceed with the work. Defendant relied upon securing title to the lands involved in the condemnation suit before they would actually be needed. In this respect defendant was at fault — first in anticipating the early decision of its litigation and secondly in not resorting at once to the provisions of Section 258a (5), Title 40, United States Code, and taking immediate title and possession of the lands. Why the more prolonged method of acquiring title and possession was adopted is not. explained.
It is urged in behalf of the defendant that the plaintiff' could have proceeded with the work by using the river and transporting by water its materials, equipment, etc., to the site of the work. The plaintiff subsequent to January 6,, 1933, was doing the best it could, and while it is impossible to state that the work could not have proceeded from the river side, the record supports a statement that on the date the contract was let neither the defendant nor plaintiff contemplated that course.
We cannot infer from the record that the defendant intended to make the performance of the work extremely costly when a more inexpensive way was available, and this fact is confirmed by paragraphs (a) and (c) of the general specifications, which we quote:
(a) The locality of the work provided for herein is subject to atmospheric temperatures as low as minus. 40° F. and the normal period of ice formation on the surface of the river is from November to April.
(c) Railway connection immediately at the lock is. afforded by the Chicago, Milwaukee and St. Paul R. R. Water transportation is also available during the navigation season (April 10 to November 10) from all Eoints on the Inland Waterway System. An improved ighway is in close proximity to the site.
When the defendant disclosed as it did in the specifications quoted the physical data known to it and invited bidders to visit the site and make their own inspection, it pointed out the local conditions existing at the site of the work and by so doing induced bidders to bid accordingly.. *367 Paragraph (c) noted the availability of the railroad. It was not available until a much later date, and the defendant was aware of this fact.
Aside from the fact that the defendant knew the difficulties attending the performance of the work in the winter months and during the high-water season, it is true that irrespective of the means of approach to the shore side of the river the plaintiff could not construct the cofferdam specified without the railroad company’s consent, and the esplanade exacted title to a portion of the company’s right-of-way.
As late as June 23, 1933, the defendant notified the plaintiff as follows:
It is not my intention at this time to order the construction of the upper guide wall or any permanent:, structure above elevation 645 under the contract, but to> direct you, under the provisions of paragraph 13 of the? specifications, to so carry on the work at this time as' to avoid construction on the upper guide wall which would encroach above this elevation.
I am taking action in the matter of seeking to obtain immediate possession of the lock site, which I hope will be successful in a short time. I shall advise you further-in this matter in the near future.
When the contract work was completed the plaintiff submitted a claim for the allowance of the extra costs and expenses incurred by reason of the defendant’s failure to-acquire title to the site until sixty-nine days had elapsed. This claim was finally passed on by the Chief of Engineers and allowed. It was not paid, though approved by the. Acting Secretary of War.
The defendant objects to including in the findings the-facts stated in Finding 22 on the ground that the officials acting were without jurisdiction to determine a case for unliquidated damages, citing the case of Snare & Triest Co. v. United States, 75 C. Cls. 326. We do not cite the determination of the claim as binding upon this court. On the contrary, we award a judgment upon the basis of the present, record.
The determination of the officials of the Government hav- - ing to do with the contract in suit is a fact, a proceeding,; *368 in tbs course of the administration of the transaction, and as part thereof to be considered and given such weight as the court thinks it is entitled to receive. As a matter of fact, the record in the case sustains a judgment for a much larger sum than the officials found due, but inasmuch as the plaintiff claims no more, we think what is claimed is amply supported by the record.
The case of McCloskey v. United States, 66 C. Cls. 105, differs from the instant one as to some facts. As a precedent it establishes the principle that a failure upon the part of the defendant to make available to a contractor the site upon which the work is to be performed if it occasions delay in performance and causes damages to the contractor entitles him to recover his loss.
It is true that in the McCloskey ease an independent oral agreement upon the part of the defendant to clear and have the site for the work available by a date sufficient in point of time for the contractor to commence and complete the work according to the provisions of the contract, was established. However, in Worthington Pump & Mach. Corp. v. United States, 66 C. Cls. 230, 240, the court held as follows:
True, the Government did not expressly agree to have the pump well ready by any fixed time, but the contract provided that the plaintiff should install .the pumps at a fixed date, and it could not do so unless the pump well was ready some time in advance of the date so fixed. There was an implied contract on the part of the Government that the well would be ready, * * *.
The case of Carroll et al. v. United States, 76 C. Cls. 103, and the following cases, Snare & Triest v. United States, 43 C. Cls. 364, Kelly & Kelly v. United States, 31 C. Cls. 361, involve a determination of a legal question similar to the one in suit. We think that from both the standpoint of facts and law the plaintiff is entitled to recover. Plaintiff under its contract was to perform the work in accord with the specifications; no alternative was granted. Plaintiff could not meet the requirements of the specifications within the time limit fixed for performance because the defendant did not possess title to sufficient lands to enable it to be done. On the contrary, the defendant’s failure *369 to make available means for the performance of the work increased its final cost and caused the plaintiff to incur a loss it was not under obligation to incur, and for which we award a judgment.
Plaintiff is awarded a judgment for the sum of $102,-841.08. It is so ordered.
Whaley, Judge; Littleton, Judge; and Green, Judge, concur.
Williams, Judge, took no part in this decision.