N. Jeanne WERTZ

v.

The UNITED STATES.

No. 562–78.

United States Claims Court.

Jan. 25, 1983.

Susan L. Korfanty, Arlington, Va., for plaintiff.

Lynn Bush Ferguson, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. Helene M. Goldberg, Small Business Administration, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION

HARKINS, Judge.

Plaintiff's petition, filed in the United States Court of Claims on December 27, 1978, claimed the Small Business Adminis-

tration (SBA) had contracted for a study and a report on the specific subject of women and small businesses. After a prolonged preparation period, trial was held December 6–9, 1982.[1] After the trial concluded on December 9, 1982, a bench ruling was made that plaintiff had failed to prove the alleged contract, and that, after the transcript was filed, findings of fact and an opinion would be entered and plaintiff's claim would be directed to be dismissed.[2]

## FACTS

N. Jeanne Wertz is a small business entrepreneur who, for 10 years prior to 1972, had operated a management consulting and publishing firm in New York City, which provided services to corporate clients for research and investigation into women's interests and women's markets. Prior to the transactions involved in this case, plaintiff's business experience had been limited to private industry.

Plaintiff's initial contact with the SBA was at the District of Columbia field office in the spring of 1972. At that time she discussed with the Assistant District Director for Management Assistance the various types of assistance available in SBA for women in business and the need for some specialized assistance for women in business. During the summer of 1972, plaintiff was directed to other personnel and discussed other activities at the D.C. field office. Ultimately she was referred to the main office of SBA, where after discussions with the Deputy Director of Management Assistance on her background and interests, an appointment was arranged with Dr. Emanuel W. Sandberg, Assistant Administrator for Planning, Research and Analysis, whose responsibilities, among others, included review and analysis of special studies and programs. Dr. Sandberg, as an official who reported directly to the Administrator, was a member of the Management Committee of SBA.

1. Delay was caused by changes in plaintiff's counsel and periods of pro se representation. Between Dec. 27, 1978, and Jan. 7, 1983, plaintiff was represented for varying periods by four different attorneys of record; she was represented pro se from May 9, 1980, to June 12, 1981, and from Mar. 1, 1982, to Oct. 20, 1982.

2. The transcript was filed Jan. 10, 1983.

Plaintiff met with Dr. Sandberg for 2 hours on September 19, 1972. There were discussions of plaintiff's background, a research study plaintiff had prepared for Continental Oil Company (Conoco study) and the possibility of a comparable study for SBA on the subject of women and small business. Plaintiff presented a 3-page memorandum to the SBA, dated September 19, 1972, "Re: The SBA and Women" and headed "For Discussion" which stated "I would like to conduct a study for the SBA on the specific subject of women and small businesses." This document was a preliminary outline and an invitation for further negotiations; it was not an offer for a specific contract. Dr. Sandberg was favorably impressed and indicated he would explore the matter further.

Dr. Sandberg took the September 19, 1972, "For Discussion" memorandum to a meeting of the SBA Management Committee, which accepted his recommendation that SBA needed to take a further look. The SBA Management Committee met weekly; it was composed of the department heads who reported to SBA Administrator Thomas S. Kleppe.

Dr. Sandberg set up an ad hoc committee composed of representatives from each of the operating departments, and invited plaintiff to make a presentation at a meeting to be held on November 15, 1972. At this meeting, which was chaired by Dr. Sandberg, and which lasted 2 hours, copies of plaintiff's September 19, 1972, "For Discussion" memorandum were distributed, and during her presentation the Conoco study was displayed and discussed.

After plaintiff's presentation, Dr. Sandberg and other SBA representatives were enthusiastic about a project such as she described. During this meeting, availability of funds and costs were discussed. It was indicated that a study of the scope presented by plaintiff would involve an expenditure of a minimum of $100,000; and that SBA funds immediately available, because of disaster expenditures associated with hurricane Agnes, were limited to $1,700.

There was no specific directive that created the ad hoc committee. Participants for SBA at the November 15, 1972, meeting included representatives of various SBA operating departments, in addition to Dr. Sandberg's Planning, Research and Analysis Department, including Minority Enterprise, Financial Assistance and EEO and Compliance. Ad hoc committee members, other than Dr. Sandberg, were not members of the SBA Management Committee.

Ronald G. Coleman, SBA Assistant Administrator for Administration, attended part of the November 15, 1972, meeting at the request of Dr. Sandberg to explain SBA's financial policies and contract procedures. Mr. Coleman was a member of SBA's Management Committee, was delegated authority to make contracts, and, as head of Administration, he was responsible for SBA's contract functions. At the meeting, Mr. Coleman explained SBA regulations applicable to contracts for professional services and outlined SBA procurement procedures.

At the November 15, 1972, meeting, no contract was made with plaintiff by either Mr. Coleman or Dr. Sandberg. There was no agreement between plaintiff and SBA that plaintiff would be given a contract to perform a study if a proposal were submitted, nor was there any agreement about a price that SBA would pay for a study such as described by plaintiff. Dr. Sandberg believed a study and report would be a beneficial SBA project and encouraged plaintiff to go forward. Dr. Sandberg did not assure plaintiff she would be paid to prepare a proposal.

At the conclusion of the November 15, 1972, meeting, plaintiff recognized that she did not have a contract with SBA and that more preparation on her part was required to secure a contract. She did not understand SBA regulations relative to a contract for personal services or for a study report, nor did she understand SBA review procedures for unsolicited proposals. The SBA representatives left the meeting with the understanding that plaintiff would prepare a document that contained the ele-

ments required by SBA procedures for a proposal, and that such document would be submitted for review and approval by the SBA Management Committee and Administrator Kleppe.

On November 17, 1972, plaintiff by letter thanked Dr. Sandberg for the November 15 meeting, and stated she was enthused with the agreement to proceed with the next step of our project and that she would "forward an outline letter just as soon as I am able to meet with my associates."

Between the November 15, 1972, meeting and March 21, 1973, plaintiff studied SBA and its client programs by collecting materials and through interviews at the D.C. and Philadelphia field offices. Communications with the Washington headquarters concerning the project were only with Dr. Sandberg, and these were mainly by telephone conversations. In these conversations, Dr. Sandberg indicated that her submission should be completed as rapidly as possible, that it should provide detailed information about the purpose and scope of the project and include a work plan with estimates of time, costs, and personnel requirements, and that it would have to be submitted for review and approval.

In January 1973, plaintiff submitted to Dr. Sandberg a memorandum, with an attached letter, both dated January 9, 1973. The memorandum was a status report on plaintiff's activities to collect information in SBA and was concerned with possible use of funds for the SBA Section 406 program (42 U.S.C. § 2906b) "to get right into the major study effort that is imperative." The attached letter recited that the November 15, 1972, meeting decided that plaintiff (1) would review SBA and its client services and (2) prepare a report. The report was to set forth:

a) Reactions to/evaluations of those services,

b) Any recommendations feasible prior to further study,

c) The rationale and detailed plans for the major study efforts that were and are necessary, and

d) A step-by-step procedure outline.

The letter said that the review of SBA and the report were required for SBA management decision on whether to proceed with a study, and that she expected the report would be submitted at the end of January 1973.

The January 9, 1973, memorandum and the attached letter make it clear that no agreement had been reached as to compensation to plaintiff for work on a project. Dr. Sandberg did not respond because he viewed the January 9, 1973, communications as a status report that plaintiff had completed collection of background information, and that plaintiff next would bring a completed document for SBA review.

On March 21, 1973, plaintiff delivered to Dr. Sandberg by messenger, a 150-page document entitled "The SBA and Women," (the Report) with a transmittal letter, dated March 20, 1973, that stated that the advance copy was being sent "for your review only." Dr. Sandberg had not expected to receive the type of document plaintiff delivered and was surprised that it did not include a budget plan and step-by-step work schedules. Dr. Sandberg reviewed the Report, was satisfied with its contents, and sent it to the Assistant Administrator for Minority Enterprise for review by that unit.

Plaintiff met with Dr. Sandberg, for 2 hours in each session, on March 23 and March 29, 1973. During these meetings, Dr. Sandberg told plaintiff that additional funds were available, from budget reallocations, for the project recommended in the Report. Dr. Sandberg also told plaintiff he would give the project his wholehearted and enthusiastic support when it was reviewed by the SBA Administrator. Dr. Sandberg told plaintiff that the Report was not adequate as a proposal for a contract and specifically requested detailed work plans and budget schedules. Plaintiff discussed the selection of Peat, Marwick, Mitchell & Co. as a consulting firm for the project, and Dr. Sandberg agreed that a PMM representative could participate in subsequent meetings at SBA. Dr. Sandberg agreed to meet on April 9, 1973, to review a work plan and budget.

During the March 23, 1973, meeting, and in subsequent telephone conversations, plaintiff told Dr. Sandberg that she had incurred approximately $3,000 in out-of-pocket expenses in preparation of the Report, and was having a cash-flow problem. Dr. Sandberg told plaintiff he recognized the value of the effort that had gone into the Report and that he would attempt to obtain some reimbursement for her expenses. On March 29, 1973, Dr. Sandberg told plaintiff he would recommend payment of $3,000 by means of a purchase order for her expenses. On inquiry to Mr. Coleman, however, Dr. Sandberg learned that a purchase order could not exceed $2,500. Subsequently in a telephone conversation Dr. Sandberg told plaintiff only $2,500 was available and that "we will have to pick up the other $500 along the way some place."

On March 30, 1973, Dr. Sandberg prepared, for the approval of Mr. Coleman, a memorandum captioned: "JUSTIFICATION FOR ISSUANCE OF A TREASURY CHECK TO MS N. JEANNE WERTZ FOR PREPARATION OF A MANUSCRIPT REQUESTED BY AN AD HOC COMMITTEE OF SBA." This memorandum was signed by both E.W. Sandberg and Ronald G. Coleman. This memorandum is the formal authority to issue an SBA purchase order to acquire the March 21, 1973, report on payment of $2,500 to plaintiff. The memorandum recites that, by the purchase, SBA would get rights to reproduction and the right to exclusive use of the report. Dr. Sandberg states in the memorandum, that in his professional opinion the $2,500 "is substantially less than we could produce a similar report inhouse and many times less than what it would cost to purchase a similar study through conventional consulting channels." When the March 30, 1973, memorandum was written, Dr. Sandberg had discussed a payment to reimburse plaintiff's out-of-pocket expenses; but he had neither discussed nor negotiated a purchase of the Report.

SBA Purchase Order No. 72–1372 was issued on April 5, 1973. The description of the articles or services to be procured states it is: "To cover the cost of furnishing a report entitled 'The SBA and Women'," and lists seven subjects which paraphrase the Report sections in the table of contents of the Report. On April 6, 1973, Dr. Sandberg by telephone notified plaintiff that the purchase order had been approved. Plaintiff received SBA Purchase Order No. 73–1372, and later was advised by an SBA representative that a statement was required. Plaintiff submitted to SBA an invoice dated April 17, 1973, referenced to SBA Purchase Order No. 73–1372, for: "Report: The SBA and Women—$2500." The invoice contained no reservation of rights or other statement to indicate that it was a partial payment for expenses only. Plaintiff subsequently received a check for $2,500 for the Report, and deposited it on May 14, 1973.

On April 9, 1973, plaintiff and her PMM representative, Mr. Paul Carren, met with Dr. Sandberg for a 2-hour session. Plaintiff submitted a document entitled: "SBA and Women—Program Development" which contained a recommended schedule of activities and budgets.

At the April 9, 1973, meeting, plaintiff and Mr. Carren presented a program for proposed activities recommended in Phase I and Phase II of the Report. The document included a 90-day budget for the period April-June 1973 of $94,898, and a general estimate for work during fiscal year 1974, which consisted of three items only:

| | |
|---|---|
| Staff and Consultants | $ 75,000 |
| Operational Expenses | $ 63,000 |
| Program Activities | $1,000,000 |

The April 9, 1973, document was not a recapitulation of plaintiff's work during the period November 1972—March 1973. It was an attempt to remedy previously noted inadequacies in the Report as a basis for an SBA contract by the provision of additional information. It remained incomplete as a proposal for an SBA contract.

During the April 9, 1973, meeting, Dr. Sandberg remained enthusiastic about the need for a study and he encouraged plaintiff to continue to perfect a proposal. Dr.

Sandberg concurred with plaintiff that, if the project were approved and a contract awarded, plaintiff would recover compensation for her work for the November 1972— March 1973 period. After April 9, 1973, however, although Dr. Sandberg and the Planning, Research and Analysis Department continued to favor the project, the Minority Enterprise and Compliance units lost interest. No group actively opposed an SBA and women project at that time, but the project became less acceptable and was not going forward.

After the April 9, 1973, meeting, Dr. Sandberg continued to assist plaintiff in the collection of information. On May 1, 1973, at her request he advised the Census Bureau, General Economics Statistics Division, that the SBA was interested in a census of women owners and managers of business firms and requested information about "the extent of the detail which is now under consideration and the estimated cost of the project."

Thereafter working relationships between Dr. Sandberg and plaintiff deteriorated. Meetings were cancelled and telephone inquiries were not answered. On May 16, 1973, plaintiff complained to Dr. Sandberg about delays relative to the SBA and Women project, and submitted a statement for services that was based on the budget in the April 9, 1973, recommended schedule of activities. The statement also included billing for a professional fee for the exploratory research project and the Report. The statement listed:

| | |
|---|---|
| Basic Fee and Expenses | $ 5,826.50 |
| SBA and Women Project Professional Fee | $ 5,000.00 |
| (SBA P.O. # 73–1372 $2,500 toward payment of acknowledged research/report expenses of $2,689.05) | |
| TOTAL DUE | $10,826.50 |

On June 1, 1973, plaintiff submitted a statement for June 1973, that listed N. Jeanne Wertz as Project Director at a professional fee of $2,500 per month and $167.30 operational expenses. The balance claimed in the May 16, 1973, statement was reiterated, and the total amount claimed as due was $13,493.80.

On June 27, 1973, plaintiff and her attorney met with Dr. Sandberg and Mr. Coleman. Plaintiff was told that SBA no longer was interested in the project and that SBA funding no longer was available for the project. Dr. Sandberg agreed that the $2,500 purchase order was for expenses and that $500 was supposed to have been picked up later. Plaintiff was told she could submit a Section 406 proposal (42 U.S.C. § 2906b) to Administrator Kleppe. An SBA file was made available to plaintiff which contained a copy of the March 30, 1973, justification for a $2,500 purchase order, and a copy of a file copy of a letter dated January 29, 1973, addressed to Ms. N. Jeanne Wertz, with space for signature by Ronald G. Coleman. The January 29, 1973, document did not bear a signature, and it previously had not been delivered to plaintiff.

Plaintiff attempted by telephone calls and letters to arrange a meeting with Administrator Kleppe but was unsuccessful.

On July 9, 1973, plaintiff by letter advised Administrator Kleppe she had prepared a 150-page report entitled "The SBA and Women," with the findings, analyses and recommendations of an exploratory study conducted for SBA. The letter stated that the study had been assigned by Dr. Sandberg and that the Report had been delivered to Dr. Sandberg on March 21, 1973. The letter advised Mr. Kleppe that following recommendations by SBA executive personnel she had prepared an unsolicited contract proposal to implement during fiscal year 1974 the full thrust of the Report's plan for SBA's initial research and assistance program for women entrepreneurs. The letter requested a personal meeting to submit the proposal.

On July 19, 1973, plaintiff arrived at Mr. Kleppe's office for an appointment scheduled by his secretary specifically to submit to him her unsolicited Section 406 proposal. She was referred instead to H. Gregory Austin, SBA General Counsel and SBA attorney Donald W. Farrell. Plaintiff was

not accompanied by an attorney. Plaintiff left Mr. Austin's office and returned to Administrator Kleppe's office, where she left a copy of her Report—The SBA and Women—and a document entitled "Unsolicited Proposal for SBA Contract" dated July 19, 1973. Plaintiff did not meet with Administrator Kleppe. By letter dated July 20, 1973, Mr. Austin returned both the Report and the unsolicited proposal. Mr. Austin's letter denied any obligation to plaintiff beyond the $2,500 already paid and recommended plaintiff seek legal advice.

On November 9, 1973, plaintiff by counsel filed a claim with the SBA for $100,000 for the value of work, out-of-pocket expenses, the value of the Report and services from the inception of the project in November 1972 through year end FY 1973. SBA denied this claim on December 6, 1973.

On March 29, 1974, plaintiff through counsel filed an administrative action against the SBA with the GAO. On October 9, 1975, GAO denied plaintiff's claim.

## DISPOSITION

█ Plaintiff contends that at the November 15, 1972, meeting the SBA agreed that she would conduct a study and produce a report on the subject of women and small businesses. She claims the study was made from November 15, 1972, through January 1973, and that the report SBA wanted was delivered on March 21, 1973. She seeks judgment for the reasonable value of her report and for services through July 10, 1973, in the amount of $81,623.41, less $2,500 received for out-of-pocket expenses, a total of $79,123.48.

Plaintiff does not show a formal written instrument of her agreement, but claims an implied-in-fact contract evidenced by a collection of documents and a course of conduct by SBA officials. Plaintiff's main documentary evidence is: her September 19, 1972, "For Discussion" memorandum; her

January 9, 1973, status report and attached letter to Dr. Sandberg on the November 15, 1972, meeting with Dr. Sandberg and other SBA personnel; her March 21, 1973, Report; SBA's March 30, 1973, justification to purchase a manuscript; and her May 16, 1973, invoice. The course of conduct plaintiff cites to support an implied-in-fact contract includes the initial enthusiasm Dr. Sandberg and other SBA personnel had for her project; status reports to and conversations with Dr. Sandberg; SBA representations to Congress and the Census Bureau; SBA's alleged use of her work product, particularly the Administrator's policy statement; and changes in SBA regulations to reduce sexually oriented terminology.

The facts do not accord with plaintiff's claim.

The provisions of the Federal Property and Administrative Services Act, of 1949, as amended,[3] applies to SBA contracts to procure services and reports, as do the implementing Federal Procurement Regulations (FPR) applicable to negotiated procurements.[4] The procurement statutes and regulations have been established by Congress to prevent favoritism, and other abuses, in the award of government contracts. Parties who seek government business in ignorance of these safeguards do so at their peril.

In this case, plaintiff's claim not only lacks the support of formal contract instruments routinely prepared under the procurement procedures, plaintiff also failed to ascertain, and assure compliance with, SBA's internal review procedures that apply to the award of contracts for studies and reports. There can be no dispute that plaintiff did not have a formal, express contract to perform services in a project for the SBA that she claims.

█ This court has jurisdiction over contracts which are implied-in-fact.[5] A

---

3. 41 U.S.C. §§ 251 et seq. (1976).

4. 41 C.F.R. §§ 1–3.200 et seq. (1980).

5. 28 U.S.C. § 1491, *as amended* by Pub.L. No. 97–164, Apr. 2, 1982, 96 Stat. 39; *Russell Corp.*

*v. United States,* 210 Ct.Cl. 596, 537 F.2d 474 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 81, 50 L.Ed.2d 791 (1977); General Order No. 1, Oct. 7, 1982.

contract implied-in-fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement.[6] It is essential, however, that the acceptance of an offer be manifested by conduct that indicates assent to the proposed bargain.[7] The requirements of mutuality of intent, and the lack of ambiguity in offer and acceptance, are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.[8]

■ Implied-in-fact contracts differ from contracts implied-in-law (quasi contracts), where a duty is imposed by operation of law without regard to the intent of the parties. Such arrangements are treated as contracts for purposes of remedy only. The Claims Court has no jurisdiction to render judgment against the United States based upon a contract implied-in-law.[9]

Plaintiff's evidence does not establish that SBA's representatives at the November 15, 1972, meeting intended to enter a contract with plaintiff. The SBA representatives at the meeting, with the exception of Mr. Coleman, were not authorized to negotiate or execute a contract. Indeed, none of the SBA's representatives considered the discussions to be other than exploratory in nature. Dr. Sandberg, while enthusiastic for the project, was not authorized to contract for the SBA for such a project. In addition, at the November 15, 1972, meeting, plaintiff was told about contract regulations and SBA's review and approval procedures. The fact that plaintiff did not understand the limitations on Dr.

Sandberg's authority and SBA's internal review procedures is no excuse. Plaintiff is required to be aware of applicable regulations and limitations on the Government representatives' authority.[10]

The January 9, 1973, status report and attached letter to Dr. Sandberg demonstrate that plaintiff recognized that additional work was required before SBA could make a management decision on the project, and that no agreement had been reached on compensation for plaintiff's work. The January 9, 1973, documents indicate that plaintiff may have proceeded under the erroneous impression that the ad hoc committee had agreed on a project. This error, however, cannot provide the ad hoc committee with contracting authority or amend the review and approval requirements of SBA's internal procedures.

Plaintiff emphasizes the circumstances related to the April 5, 1973, purchase order and its March 30, 1973, justification to support her argument that a contract came into existence for the project recommended in her September 19, 1972, "For Discussion" memorandum and in her March 21, 1973, Report. Plaintiff places particular reliance on the caption of the March 30, 1973, justification that shows the $2,500 payment was to purchase a manuscript requested by the SBA ad hoc committee. Plaintiff's assertion that the purchase order transaction has such significance must fail. The terms of the documents related to the purchase order do not support plaintiff's interpretation, and there is no writing or other evidence contemporaneous with the purchase order transaction that supports her claim to a

---

6. *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319, 39 S.Ct. 300, 302, 63 L.Ed. 620 (1919); *Penn-Ohio Steel Corp. v. United States*, 173 Ct.Cl. 1064, 1085, 354 F.2d 254, 267 (1965).

7. *Thomson v. United States*, 174 Ct.Cl. 780, 791, 357 F.2d 683, 689 (1966); *Penn-Ohio Steel Corp. v. United States, supra* note 6, 173 Ct.Cl. at 1086, 354 F.2d at 267.

8. *Algonac Mgf. Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255 (1970); *Fincke v. United States*, 230 Ct.Cl. ——, 675 F.2d 289 (1982).

9. *Putnam Mills Corp. v. United States*, 202 Ct.Cl. 1, 8, 479 F.2d 1334, 1337 (1973); *Algonac Mfg. Co. v. United States, supra* note 8, 192 Ct.Cl. at 674, 428 F.2d at 1256; General Order No. 1, Oct. 7, 1982.

10. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Jascourt v. United States*, 207 Ct.Cl. 955, 521 F.2d 1406 (1975).

contract for more than reimbursement for her out-of-pocket expenses.

The April 5, 1973, purchase order clearly states that its purpose was to cover the cost of furnishing the Report. Plaintiff's April 17, 1973, invoice specifically referenced the purchase order by number and was limited to a description of the Report and its price. Plaintiff's April 17, 1973, invoice does not on its face establish that the $2,500 payment was for any purpose other than to furnish the Report described.

The purchase order transaction does not provide evidence that SBA officials intended to enter an implied-in-fact contract for the project plaintiff asserts. By the time plaintiff submitted an invoice on May 16, 1973, for a $5,000 professional fee with a notation that the purchase order had been payment of $2,500 toward expenses of $2,689.05, the relationship of the parties had changed significantly. The May 16, 1973, invoice is not sufficient evidence to establish the parties' intentions as of April 17, 1973, nor to amend the purchase order documentation.

This matter is complicated by SBA's misuse of its purchase order procedures. SBA's April 5, 1973, purchase order was not issued to purchase the Report, it was a device used by Dr. Sandberg and Mr. Coleman to alleviate plaintiff's cash-flow problem and provide some compensation for her out-of-pocket expenses.[11] Their justification for the issuance of the purchase order does not accord with the facts:

> The ad hoc committee at the November 15, 1972, meeting had not requested plaintiff to prepare a manuscript; in fact, plaintiff's delivery of the Report was unexpected by Dr. Sandberg and other SBA participants, and was a surprise.
> The purpose of the transaction in fact was not to purchase a manuscript; it was a device to compensate plaintiff for some of her out-of-pocket expenses. Dr. Sand-

berg had discussed the possibility of purchasing the report with Mr. Coleman, but he had not discussed such a purchase with plaintiff, nor had he negotiated with plaintiff a price for such a purchase. The March 30, 1973, justification facially appears to relate to a transaction prospective in nature; in fact, the Report already had been delivered and was in the possession of Dr. Sandberg.

This abuse, or violation, of SBA's purchase order procedures by Dr. Sandberg and Mr. Coleman, while it does them no credit, does not establish that the $2,500 payment was for more than plaintiff's out-of-pocket expenses, or that there was an implied-in-fact contract between the parties for the project claimed by plaintiff.

Plaintiff asserts that defendant's use of the Report is evidence of an implied contract and, in addition shows that the Government received substantial benefits which entitle plaintiff to compensation. Examples of alleged use of the Report include the December 9, 1974, EEO policy statement issued by the Administrator, preparation of a census study, creation of a women's department in SBA, SBA representations in testimony and reports to Congress, and elimination of sexually oriented language in SBA regulations. Defendant vigorously disputes that plaintiff's evidence is adequate to establish that the SBA's actions were based upon information in the Report.

▪ Even if plaintiff's contentions as to such use are accepted, however, such evidence would not be effective to prove that a contract implied-in-fact was entered in the period November 1972 to April 1973. Nor would the use of the information in the Report by the Government in itself justify compensation on a theory of a contract. Such use would indicate that the Government had benefited, and in equity would have an obligation. A suit to recover com-

---

11. In the Mar. 23 and Mar. 29, 1973, conferences, there was discussion that plaintiff's out-of-pocket expenses amounted to approximately $3,000, and Dr. Sandberg said he would attempt to secure that amount. He later learned that purchase orders in sole source procurements were limited to a $2,500 maximum, and he told plaintiff that "we will have to pick up the other $500 along the way someplace."

pensation on a *quantum meruit* (reasonable value of work or labor) or *quantum valebat* (reasonable value of goods sold and delivered) basis, however, is an action on a contract implied-in-law, and is beyond the jurisdiction of this court.[12]

In limited circumstances, the United States Court of Claims has allowed recovery on a value received theory. Where this occurred, the circumstances required a showing not only that the Government had received the benefit but that the unauthorized action was expressly or implicitly ratified by Government officials authorized to act.[13]

■ Plaintiff also suggests that equity and fair dealing on the facts of this case require the Government to recognize an obligation that the Government is estopped to deny. The doctrine of equitable estoppel was applied by the Court of Claims, and will be applied by this court, in an appropriate case to prevent the United States from denying the existence of a contractual agreement.[14] For the doctrine of equitable estoppel to be applied, however, the facts must show the following elements to be present: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.[15]

■ The facts of this case provide no justification for application of the doctrine of equitable estoppel. The requisite elements are not present. At the close of the November 15, 1972, meeting neither Dr. Sandberg nor any of the other SBA participants have been shown to have been aware that plaintiff did not understand that her next step was to prepare a proposal for further review. At the conclusion of the meeting, plaintiff recognized that she did not have a contract and that more preparation on her part was required to secure a contract. Her failure to prepare a proposal that complied with SBA procedures was unreasonable in the light of Dr. Sandberg's and Mr. Coleman's statements at the November 15, 1972, meeting and the statements of Dr. Sandberg in their discussions during the period from November 15, 1972, to March 29, 1973.

---

On January 7, 1983, plaintiff filed a motion for leave to file a motion to reinstate the petition and reopen proof. Plaintiff listed the following reasons for reopening the trial, which is requested to be reconvened 60 days after plaintiff's receipt of the trial transcript.

"1. Defendant has purposely misled and deceived this Court in instances which were apparent only after the close of trial;

2. Key Defendant witnesses have offered untruthful testimony to bolster the Defendant's case;

3. Defendant, by intentionally, steadfastly refusing to comply fully in the discovery process, deprived Plaintiff and this Court of necessary evidence in that, for example

---

12. *U.S. Steel Corp. v. United States,* 210 Ct.Cl. 228, 536 F.2d 921 (1976); *Fincke v. United States, supra* note 8, 230 Ct.Cl. at ——, 675 F.2d at 295; *Ables v. United States,* Ct.Cl. No. 666–80C (order entered Mar. 26, 1982).

13. *Prestex Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367 (1963). *New York Mail & Newspaper Transp. Co. v. United States,* 139 Ct.Cl. 751, 154 F.Supp. 271, *cert. denied,* 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957).

14. *Manloading & Management Assoc., Inc. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299 (1972); *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 98 F.Supp. 757, *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951); General Order No. 1, Oct. 7, 1982.

15. *Emeco Indus. Inc. v. United States,* 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973); *United States v. Georgia Pacific Co.,* 421 F.2d 92, 96 (9th Cir.1970).

a. Defendant evasively, untruthfully responded to Plaintiff's interrogatories, and

b. Defendant did not provide, as exhibits, original Agency copies of crucial documents to Plaintiff nor to this Court, as required, but chose instead, for the apparent purpose of misleading the Court, to provide copies of Plaintiff's own documents;

4. Defendant deliberately withheld the Agency copy of its own Purchase Order, a document essential to Plaintiff's case and critical to the defense posed by the Government."

If the trial is permitted to be reopened, plaintiff would hear testimony from two witnesses: Dr. Sandberg (recalled) and Mr. Paul Carren, plaintiff's consultant from Peat, Marwick, Mitchell & Co. On reopening, plaintiff would continue a limited hearing to explore the facts and circumstances surrounding the issuance of the April 5, 1973, purchase order.

In the exercise of its jurisdiction to provide relief for claims against the Government, the Court of Claims traditionally was liberal in remands after trial and submission, if it seemed that the ends of substantial justice would be served.[16] Reopening proof before final judgment has been recognized by the Supreme Court as appropriate practice in federal courts, and the Court has affirmed the principle that a motion to re-

open is entertained in the sound discretion of the trial judge.[17]

 The motion to reopen is appropriate to raise substantive issues of fact and law not previously heard and is not limited to offers to prove mere formal deficiencies in the trial record. It is of little significance when the motion is made, although it is clear that it will be more favorably viewed if made during the course of trial.[18] A motion to reopen to permit the taking of additional evidence after the jury has been charged may be granted;[19] in a nonjury case, the motion may be allowed months after the case has been submitted to the trial judge;[20] and the motion to reopen may be allowed after the trial judge has made a preliminary decision or findings of fact.[21]

 The standards to weigh a motion to reopen are applied largely within the discretion of the trial judge. These standards include: (1) the moving party must show diligence or justification for failure to discover and present the proposed evidence during the ordinary course of the trial;[22] (2) the moving party must be prepared to state specifically what the additional evidence would be;[23] (3) the proffered evidence and testimony which would result from granting the motion must not be

---

**16.** *Shrewsbury v. United States*, 13 Ct.Cl. 183, 187 (1877). In this case, the court 3 years after trial and findings against claimant remanded the case for retrial to permit production of new evidence. The court refused to remand for a third trial because "there must be a limit to indulgence to claimants in this respect."

**17.** *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77, rehearing denied, 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971); 6A *Moore's Federal Practice* ¶ 59.04[13] (2d Ed.1982).

**18.** *United States v. Maggio*, 126 F.2d 155 (3rd Cir.), cert. denied, 316 U.S. 686, 62 S.Ct. 1275, 86 L.Ed. 1758 (1942); *Nanda v. Ford Motor Co.*, 509 F.2d 213 (7th Cir.1974).

**19.** *Ross v. McLean*, 10 F.2d 627 (D.C.Cir.1925), cert. denied, 270 U.S. 656, 46 S.Ct. 353, 70 L.Ed. 784 (1926).

**20.** *Zenith Radio Corp. v. Hazeltine Research, Inc.*, supra note 17; *Gas Ridge, Inc. v. Suburban Agricultural Properties, Inc.*, 150 F.2d 363 (5th Cir.), rehearing denied, 150 F.2d 1020 (1945).

**21.** *Caracci v. Brother Int'l Sewing Mach. Corp.*, 222 F.Supp. 769 (E.D.La.1963), aff'd, 341 F.2d 377 (5th Cir.1965).

**22.** *Locklin v. Switzer Bros., Inc.*, 299 F.2d 160 (9th Cir.1961), cert. denied, 369 U.S. 861, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962); *But cf.: Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*, 191 F.Supp. 937 (S.D.N.Y.1961), rev'd on other grounds, 308 F.2d 196 (2d Cir.1962), and *Bowles v. Six States Coal Corp.*, 64 F.Supp. 651 (W.D.Pa.1946).

**23.** *Swartz v. New York Cent. R.R.*, 323 F.2d 713 (7th Cir.1963); *Olson v. United States*, 175 F.2d 510 (8th Cir.1949).

merely cumulative;[24] and (4) there must be a substantial showing that the proposed evidence could materially affect the findings and the outcome of the case.[25] Consideration of a motion to reopen proof should not turn on the reason why the evidence now proffered was not introduced during the normal course of trial; the essential criterion is whether a substantial injustice would occur if the motion were not allowed and the evidence continued to be excluded.

The transactions that plaintiff cites as justification for reopening trial are the circumstances surrounding the April 5, 1973, purchase order and the facts relative to a letter dated January 29, 1973, addressed to plaintiff and purportedly signed by R.G. Coleman. In addition plaintiff points to defendant's bad faith in responses to interrogatories and the quality of defendant's exhibits introduced at trial.

The physical exhibit introduced by defendant[26] as the April 5, 1973, purchase order is a document of 2 pages that appears to be a photocopy of SBA Purchase Order No. 73–1372, which at the bottom of page 1 bears the designation—"1 Vendor Copy." The physical exhibit introduced by plaintiff[27] as the April 5, 1973, purchase order is a document of 2 pages that appears to be an original document, is marked SBA Purchase Order No. 73–1372, and at the bottom of page 1 bears the designation—"1 Vendor Copy." A line for the signature of Bernice T. Abston, Assistant Chief Procurement and Supply Branch, on both plaintiff's exhibit and defendant's exhibit contains no handwritten signature.

Failure of an SBA purchase order to be signed by an SBA official authorized to contract for the agency, in the normal course, would make the purchase order invalid. In this case, however, the Assistant Administrator for Administration and the supervisor of the Procurement and Supply Branch had approved on March 30, 1973, issuance of a purchase order. At trial, Mr. Coleman testified that the March 30, 1973, justification was the authority for issuance of Purchase Order No. 73–1372 and the payment to plaintiff.

Abuses of SBA's procedures behind Purchase Order No. 73–1372, and the payment of $2,500 to plaintiff for the Report, have been discussed above. The fact that both purchase order exhibits in evidence lack the signature of Bernice T. Abston, in the circumstances, is without significance. Further inquiry into the circumstances that are involved in the preparation, presentation, and payment on Purchase Order No. 73–1372 is not likely to provide probative information additional to that in the record that would change the result in this case. The obvious purpose of the $2,500 payment to plaintiff, achieved by means of the purchase order device, was to compensate plaintiff in part for her out-of-pocket expenses.

Circumstances surrounding the January 29, 1973, letter are more complex. The record now includes three exhibits, each with the same typewritten information but with different handwritten notations, that purport to be copies of this document. Plaintiff's exhibit No. 4 is a document of 2 pages, with the number 2750 on the bottom right-hand corner on pages 1 and 2, that appears to be a photocopy of a carbon copy; it bears handwritten notations as follows: "Backdated. Couldn't have been written until after report submitted 3/20/73" and "Not sent per Sandberg 7/6/73." Plaintiff's exhibit No. 4(a) is a document of 2 pages which plaintiff testified was handed to her during a meeting on June 27, 1973; it appears to be a photocopy of a carbon copy; it does not bear handwritten notations or the number 2750. Plaintiff's exhib-

**24.** *Ramsey v. UMW*, 481 F.2d 742 (6th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973).

**25.** *Standard Oil Co. v. Clark*, 163 F.2d 917 (2d Cir.1947), *cert. denied*, 333 U.S. 873, 68 S.Ct. 902, 92 L.Ed. 1149 (1948); *Schick Dry Shaver,* *Inc. v. General Shaver Corp.*, 26 F.Supp. 190 (Conn.1938); *Rue v. Feuz Constr. Co.*, 103 F.Supp. 499 (D.C.1952).

**26.** Defendant's exhibit No. 2.

**27.** Plaintiff's exhibit No. 7.

it No. 4(b) is a document of 2 pages that appears to be a photocopy of a carbon copy; it does not bear the handwritten notations as described on plaintiff's exhibit No. 4 nor the number 2750; it is marked "Tab 4—Attachment 15."

Testimony at trial established that the designation 2750 on plaintiff's exhibit No. 4 indicates it was obtained by the SBA from materials in the GAO file on plaintiff's claim to the Comptroller General.

The contents of the January 29, 1973, letter support a conclusion that the document was not prepared on that date. The document describes a report that encompasses seven listed subjects. The seven subjects listed on the document are identical to the seven subjects listed in the April 5, 1973, purchase order and in the Table of Contents of plaintiff's March 21, 1973, Report. On page 2 of the letter there is the amount of $3,000 to be paid for the Report which is crossed out and $2,500 substituted. The $3,000 payment involved discussions that did not occur until March 23 and March 29, 1973, between Dr. Sandberg and plaintiff concerning her out-of-pocket expenses.

In her November 9, 1973, claim to SBA plaintiff asserted that the January 29, 1973, letter was obtained on June 27, 1973, during a meeting with Dr. Sandberg and Mr. Coleman when an SBA file was made available to her. She stated in her claim that she had never received the letter, never endorsed it, and had never returned a copy to indicate acceptance. At trial, plaintiff confirmed these events. At trial, neither Mr. Coleman nor Dr. Sandberg could recall the January 29, 1973, document, nor could they explain the origin of the exhibits or the handwritten notations thereon.

Plaintiff asserts these facts require the conclusion that the letter was written after delivery of her report on March 21, 1973, and was backdated by defendant for purposes related to the issuance of the April 5, 1973, purchase order. Plaintiff's conclusion is supported by the record. Plaintiff's allegations concerning backdating and nondelivery of the January 29, 1973, letter are accepted.

Plaintiff's exhibits Nos. 4, 4(a) and 4(b), and the circumstances surrounding their production for this case, reflect on the motives of the SBA personnel involved. On the other hand, there is little doubt that the original ribbon counterpart of plaintiff's exhibits Nos. 4, 4(a) and 4(b) was neither signed by Mr. Coleman nor delivered to plaintiff as a document representing an official SBA action.

Defendant's cavalier attitude with respect to plaintiff's discovery requests in this case warrants severe condemnation. It's belated discovery that Dr. Sandberg was not deceased, as first reported, defies belief. Acceptance of plaintiff's version of the facts relative to the January 29, 1973, document, however, while those facts reflect on the objectivity of Mr. Coleman and Dr. Sandberg, they do not alter the legal posture of plaintiff's case. Nor does the acceptance of plaintiff's version of the facts magnify the purchase order transaction to the end sought by plaintiff. It is doubtful if further inquiry into these matters would be productive. Defendant's witnesses, although interrogated vigorously, had no recall. It is unlikely that the origin of, or the purpose of, the January 29, 1973, documents would be clarified in further proceedings.

For the foregoing reasons plaintiff's motion for leave to file its motion to reinstate the petition and reopen proof is allowed, plaintiff's motion to reinstate the petition is denied without prejudice, and plaintiff's motion to reopen proof is denied.

Plaintiff's petition, now complaint, must be dismissed.