**UNITED STATES STEEL CORPORATION**

v.

**The UNITED STATES.**

No. 405–74.

United States Court of Claims.

June 16, 1976.

James T. Carney, Pittsburgh, Pa., attorney of record for plaintiff.

Stephen Anderson, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

SKELTON, Judge.

This is an appeal by United States Steel Corporation (USS), plaintiff, from a decision of the Department of Labor Board of Contract Appeals (the Board), in which USS claims damages for an alleged breach of contract by the Department of Labor (DOL), with which it had a contract, and also claims alleged mitigating damages, plus a recovery on an alleged implied contract. The United States, defendant, denies that a breach of the contract occurred, and contends that there are no compensable mitigating damages, that no recovery can be allowed on an implied contract theory, and that the Board did not have jurisdiction of the case. The case is before us on cross-motions for summary judgment. The defendant has summarized the basic facts in the case, which we use in part, with additions and changes, to explain the nature of the case.

On November 12, 1969, plaintiff, United States Steel Corporation and defendant, Department of Labor, entered into a JOBS MA–5 fixed price contract, No. 16–0–5005–000. The contract period was from January 5, 1970 to June 5, 1971. The contract contained a disputes clause but no changes clause.

In general, the contract called for the filling of 1,872 entry level job slots at USS by training hard-core unemployed individuals certified by the Indiana State Employment Service (SES) and the Concentrated Employment Program (CEP). The cost of the contract was based upon only the training needed to make hard-core unemployed persons employable—the training USS normally gave to new employees was not part of the contract.

Instead of being directly reimbursed for the costs of the training program as they were incurred, USS was to be paid $13.94 for each day worked by a JOBS trainee, up to a maximum of 195 days in each of the 1,872 job slots. The maximum amount payable under the contract, therefore, was $2,717.68 per job slot, or $5,087,497 overall.

Although the contract was designed to maximize the contractor's incentive to keep trainees on its payroll, it was acknowledged that, for many reasons, not all trainees would work the full 195 days needed for USS to receive the maximum contract amount. The contractor was allowed, therefore, to replace a lost trainee in a given job slot with a new recruit. By so doing, USS could continue to receive payment for the days worked in that job slot until the combined number of days worked

by the initial trainee and any replacement(s) equalled 195.

Because it took 195 work days (39 weeks) for USS to receive the maximum contract amount for each job slot, it was anticipated that all the job slots would be filled initially by the time there were only 39 weeks left in the contract period. This meant that an average of 48 new trainees was needed during each of the first 39 weeks of the contract.

During the first 10 weeks of the contract, SES and CEP provided USS with 510 trainees, 30 more than the rate of 48 per week. During the next three weeks—the last three weeks in March 1970—the trainees numbered only 108, 36 less than the rate of 48 per week. That made the cumulative number of trainees provided during the first 13 weeks of the contract 618, six trainees short of the rate of 48 per week (an average of 47.54 trainees per week). The following week—the first week of April— 62 new trainees were accepted into the program.

Beginning April 1, 1970, USS conducted its own special recruiting program to supplement the recruits obtained through SES, CEP, and the contractor's normal recruiting operation. This special recruiting effort eventually included the distribution of handbills, the intermittent use of a mobile recruiting van, and the services of three USS recruiters. USS has claimed the cost of the special recruiting to be $70,753. It is undisputed that this effort was not part of the express contract between the parties.

On April 20, 1970, USS hired six job trainers who were given the title of Head Job Trainers. It is undisputed that these were in addition to the job trainers called for in the contract. The head job trainers were employed in that capacity for various lengths of time but no later than September 1, 1971. USS claims the cost of the head job trainers was $135,954.

On June 22, 1970, a meeting occurred at the contractor's plant in Gary, Indiana (Gary Works). Present were Eugene E. Harris for USS and Michael S. White of the Regional Manpower Administrator's Office,

Department of Labor. The meeting occurred during one of Mr. White's regular visits to Gary Works to monitor the contract performance of USS. He was not the contracting officer. It is undisputed this meeting was the first time USS advised DOL of the head job trainers. It is also undisputed that USS gave Mr. White no indication that USS expected to be paid for the head job trainers except as they might increase the number of days invoiced under the contract for work by JOBS trainees. Nor was any indication given that USS felt DOL had breached the contract or that DOL was in any way responsible for the cost of the special recruiting effort.

During September 1970, USS began to lay off employees in departments affected by a labor dispute at General Motors. Because of its own labor agreement, USS could not place new trainees in those departments so long as more senior employees were laid off. Although trainees did not begin to work in a given department until the 13th week of employment at USS, they had been pre-assigned to departments during the first week of training and to a certain extent their training differed depending on the department to which they were assigned. Hence at the same time it began to lay off its regular employees in a given department, USS also had a number of trainees in various stages of preparedness to take jobs in those departments. To avoid laying off these trainees at the end of their twelfth week, i. e., at the time they would normally begin to work in their assigned department, USS kept them in the training program, retraining them to work in different departments. USS claims the cost of this "special training program" was $277,069.

On November 13, 1970, a meeting occurred at Gary Works between Eugene E. Harris of USS and Paul Burse. It is undisputed that at no relevant time was Mr. Burse an employee of the Government. He was, however, employed by Henderson & Associates, which had a contract with the Government to audit the USS JOBS MA–5 contract. It is also undisputed that Mr.

Burse was advised as to the special training program at that meeting.

On November 17, 1970, at the request of DOL, a second meeting was held with USS representatives at Gary Works. Present were Richard Reece, J. H. Cawley, and Michael White for DOL and D. W. Braithwaite, P. C. Fissinger, V. C. Sutcliffe, and Mr. Harris for USS. This meeting occurred seven months after the hiring of the head job trainers and the commencement of the special recruiting effort and almost two months after the beginning of the special training program. It is undisputed that all three areas were discussed, that this was the first time DOL employees had been officially advised of the special training program, and that USS indicated that these efforts had been undertaken with the continuing expectation that their cost would be more than recouped by improving the ratio of days worked per trainee, thereby increasing USS's payments under the contract.

By a modification to the contract dated December 10, 1970, the contract period was extended from June 5, 1971, to November 12, 1971. Aside from a modification on March 9, 1970, not relevant here, this was the only modification executed under the contract.

On May 26, 1971, a third meeting occurred between USS and DOL representatives. Present were W. P. Jones and S. Ganz, for USS and B. Lewis, contracting officer, and E. Harp for DOL. At that meeting USS made a request for the first time to be paid for the special recruiting program, the head job trainers, and the special training program. It is undisputed that as to the head job trainers and the special training program no agreement of any kind was reached. It is further undisputed that prior to this meeting no contract modification had been sought by USS. As to the special training program there is some dispute as to what exactly was said by DOL representatives, but it is undisputed that the contracting officer said that if USS had wanted a contract modification it should have sought one earlier. It is further undisputed that no final agreement

was reached as to any of the demands made by USS and that DOL agreed to send a representative to Gary Works to gather more information.

On June 9, 1971, a fourth meeting occurred, this time between Messrs. Braithwaite, Abbott, Miller, and Harris for USS and Mr. White for DOL. At this meeting USS made an explicit demand for reimbursement of the costs incurred for head job trainers, special training, special recruiting, and other claims now pursued before this court.

By a final opinion dated December 4, 1972, the contracting officer denied the claims discussed at the meeting of June 9, 1971.

On August 15, 1974, the Department of Labor Board of Contract Appeals entered its decision as to the contractor's appeal of the contracting officer's final decision. The Board found that all of the contractor's claims, with one small exception, were extra-contractual. Hence the cost of head job trainers and the special recruiting effort were entirely disallowed. As to the special training program the Board found that most of the costs were attributable to training that duplicated training for which USS had already been paid under the contract, and denied recovery as to those costs. The Board also found, however, that the job simulation, or vestibule training, was not duplicative and that the $38,369.47 cost thereof was payable under the contract.

The Department of Labor Board of Contract Appeals found that the majority of plaintiff's claims were for extra-contractual services or for damages which, if valid, could only be attributable to a breach of contract by defendant. The Board acknowledged that it had no jurisdiction to grant relief as to those claims because the contract did not contain any provision allowing an equitable adjustment in the contract price.

Following the decision of the Board, USS filed suit in this court claiming that DOL had breached the contract by failing to furnish it 48 trainees per week and because of which it suffered direct damages in the

sum of $50,083.95, and suffered additional damages in the sum of $70,753 representing a recruiting program it voluntarily instituted to obtain more recruits or trainees for the program, all in the total sum of $120,836.95.

In addition to the claims for the alleged breach of contract stated above, plaintiff contends that it is entitled to recover on a quantum meruit or quasi-contract basis for extra training expenses not provided for in the contract for which was known as vestibule training of the trainees in the sum of $227,069, and for the expense of six additional head trainers used in such extra or special training program in the sum of $135,954, all in the total sum of $363,023.

The defendant says that it did not breach the contract and plaintiff's breach of contract claims are without merit. Defendant says further that there is no basis for plaintiff's quantum meruit claims because they are based on activities and transactions of the plaintiff not provided for in the contract and for which defendant is not liable. We will now consider these claims of the parties.

I

*The Breach of Contract Claim*

■ The contract provided that the program would be conducted over a 52-week period for 1,872 persons who would be recruited and trained in groups of 48 per week for 12 weeks. The furnishing of the recruits was to be a joint effort of SES, CEP and USS. There was no requirement that DOL was to furnish 48 trainees per week. In fact, the contract provided:

> The objective of this proposed program is to hire and provide training for 1,872 individuals certified as hard-core unemployed by the State Employment Service (SES). *The individuals will be recruited using the resources of the U. S. Steel Corporation's recruiting process and the State Employment Service (SES).* [Emphasis supplied.]

This provision imposed at least some obligation on USS to recruit at least some of the trainees. In other words, the whole burden and obligation was not imposed on SES. It appears that DOL was not to do any of the recruiting, but was only to pay for the training of the persons who participated in the program. The facts show that an average of 48 trainees was needed during each of the first 39 weeks of the program because it required 195 days (39 weeks) for USS to receive the maximum amount for each of the 1,872 slots. During the first 10 weeks, SES and CEP provided referrals that resulted in 510 trainees, 30 more than 48 per week. During the last three weeks in March 1970, the referrals accepted as trainees amounted to 108 or 36 less than the rate of 48 per week. This meant that referrals resulting in 618 trainees were provided during the first 13 weeks, which were six trainees short of the 48 per week, or an average of 47.54 trainees per week. During the following first week of April, 62 new trainees were accepted. USS said nothing about a breach of contract until after November 12, 1971, following the expiration of the extended contract when it claimed that defendant had breached the contract in March 1970, by failing to supply it with 48 trainees per week. However, it is significant that for almost two years (March 1970 to November 1971) USS continued in the performance of the contract and received its benefits in the form of payments, without in any way indicating it was claiming a breach of contract. Even if a breach occurred in March of 1970, which we do not think was the case, the shortage of trainees accepted by USS from the referrals furnished by SES and CEP was so minimal as to be insignificant. Furthermore, as pointed out above, USS had some obligation itself to provide some of the trainees—surely this could require it to supply at least the missing .46 of one trainee (48 less 47.54).

The contract was modified by an instrument dated December 10, 1970, executed March 1971, which extended the contract from June 5, 1971, to November 12, 1971. If there had been a breach of the contract by defendant, this extension of the contract cured it.

The modification was of significant benefit to USS, but the Government received no additional consideration. By the end of the 40th week of the initial contract period, 2,076 recruits had been accepted into the program. This was more than 200 recruits above the contract amount of 1,872. The initial job slots already had been filled and the balance of recruits necessarily were replacements. Had the contract not been extended, the Government would have nonetheless received all it bargained for—the filling of 1,872 job slots with otherwise unemployable trainees and up to 195 days of training for those trainees who lasted in the program. The replacement of lost trainees was at the option of the contractor. While some incidental benefit accrued to the Government in that additional unemployed people were receiving training, the hard fact is the contractor only replaced trainees if it was economically advantageous for USS to do so. The modification came at a time when it was no longer advantageous for USS to replace trainees for only the initial contract period. By extending the contract until November, DOL permitted USS to obtain 387 additional replacements and substantially improve its average return per job slot.

It follows that even if the Government breached the original contract in March 1970, the only effect of that breach was to delay plaintiff's performance, and inasmuch as the contract was thereafter modified by the parties to extend the time for performance and thereby grant plaintiff additional compensation, there was no breach of the contract as modified. *Snare & Triest Co. v. United States*, 75 Ct.Cl. 326 (1932), *cert. denied*, 289 U.S. 742, 53 S.Ct. 687, 77 L.Ed. 1489 (1933).

Not every recruit obtained by DOL and referred to USS was hired as a trainee. In fact, out of 322 referrals made by CEP prior to March 13, 1970, USS chose to hire only 44. Prior to March 28, 1970, SES made 720 referrals to USS. Consequently, at the time plaintiff alleges the contract was breached (March 31, 1970) DOL had provided USS with 1,044 referrals at the rate of 80 per week. These referrals resulted in only 47.5 new trainees per week selected by USS.

In light of the above, it is clear that, if DOL's obligation is stated as 48 referrals per week, no breach had occurred by the end of March 1970. In fact, DOL never breached an obligation to provide 1,872 referrals. The record shows that SES and CEP provided USS with a total of 2,586 referrals, far more than the 1,872 required by the contract. (1,651 referrals from SES and 935 from CEP).

Understandably, plaintiff argues that the "48 per week" requirement means 48 trainees per week. This interpretation is not reasonable because it defines DOL's obligation in terms over which it had no control. DOL did not provide *trainees* to USS, it provided referrals which were then screened by USS. Only those who passed plaintiff's own standards were actually hired as trainees. As noted above, of the first 322 referrals made by CEP, only 44 were actually hired as trainees. At that rate, DOL would have had to obtain over 13,000 referrals to meet USS's demand for 1,872 trainees. There is nothing in the contract that could be construed to impose a requirement of that magnitude on DOL. In fact, the Labor Force Summary for 1970 shows that there were only 8,800 unemployed people in the Gary, Indiana area at the time the contract began in January 1970.

DOL had no way of determining in advance how many of the referrals made in a given week would actually be hired as trainees. Plaintiff's argument necessarily implies that the contract would be breached by DOL every time USS rejected an unusually large number of trainees for medical or other reasons. It cannot be inferred that the parties intended such a result when they drafted the agreement. It would therefore be unreasonable to construe the contract language to impose such a requirement.

USS embarked on a recruiting program on its own on April 1, 1970, in order to obtain more trainees for the program. It

now says this action was taken because the defendant breached the contract in March 1970, by failing to furnish 48 trainees per week. It contends that the defendant should be required to pay the expenses of this program in the sum of $70,753 as a part of the damages for breach of contract. It should be pointed out that during the negotiation stage before the contract was executed, USS asked DOL to agree to pay the costs of a recruiting program to be conducted by USS. DOL refused to pay the costs of such a program, and, consequently, it formed no part of the contract. Now it appears that USS is trying to recover such costs by a "back door" approach, so to speak, by labeling the recruiting costs as a mitigation of damages for an alleged breach of contract.

It is obvious that USS undertook the recruiting program for its own financial gain. The more recruits it could get into the program, the more it could collect from the Government. It is undisputed that many of the original trainees did not complete the full 195 day period. Indeed, USS claims the average was 99.8 days. Using this figure, it follows that had SES and CEP furnished referrals that resulted in one trainee for each of the 1,872 job slots in a timely fashion, USS would have been able to invoice DOL only $2,604,348.80 for those trainees (99.8 days times $13.94 per day times 1,872 trainees). Any amount invoiced over and above $2,604,348.80 is therefore logically attributable to days worked by replacement trainees. In fact, plaintiff's own records indicate that 581 trainees over and above the contract number of 1,872 were employed during the course of the contract, and plaintiff eventually received $3,448,368 under the contract. Because DOL had no obligation to furnish these excess trainees, USS had to find them on its own. It did so and as a result collected $884,019.20 more than it otherwise would have collected. Accordingly, it is unreasonable for plaintiff to assert that the cost of the special recruiting program was incurred solely because of · defendant's `alleged breach.

We hold that DOL did not breach the contract and plaintiff is not entitled to recover its damage claim of $50,083.95 nor the cost of its recruiting program in the sum of $70,753.

II

*The Quantum Meruit Quasi Contract Claims*

The plaintiff seeks recovery of the following claims on a quantum meruit or quasi contract basis:

(1) Cost of employing six additional head trainers—$135,954.00.

(2) Expenses of special (vestibule) training of trainees in addition to their required basic training—$227,069.00.

■ The plaintiff admits that these costs were not included in nor contemplated by the contract, but are costs and expenses completely outside of and beyond the terms of the contract. It seeks recovery of these costs on an alleged implied in law quantum meruit or quasi contract basis. This court is without authority to grant plaintiff relief on these claims for at least two reasons. In the first place, we do not have jurisdiction under the Tucker Act (28 U.S.C. § 1491) of claims based on a contract implied in law (as distinguished from claims based on contracts implied in fact, which are within the jurisdiction of this court). Both the Supreme Court and this court have so held. *See Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 192 Ct.Cl. 649 (1970), where we held:

This court does not have jurisdiction of claims based upon contracts implied in law. The Supreme Court said in *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925):

* * * The Tucker Act does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law. * * *

*See also J. C. Pitman & Sons v. United States*, 317 F.2d 366, 161 Ct.Cl. 701, 704–5 (1963) and cases there cited. This court

does have jurisdiction of claims based on contracts implied in fact. *See New York Mail & Newspaper Trans. Co. v. United States*, 154 F.Supp. 271, 276, 139 Ct.Cl. 751, 759 (1957), *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 [*Id.*, 428 F.2d at 1256, 192 Ct.Cl. at 674.] [1]

■ In the second place, no recovery can be awarded to the plaintiff on these claims based on contracts implied in law because it is well settled that there can be no implied contract where there is an express contract between the parties, as in the instant case. 17 C.J.S. Contracts § 5 (1963); *Carpenter v. Josey Oil Co.*, 26 F.2d 442 (8th Cir. 1928). The Board so held in this case.

■ It should be remembered that the contract in issue here did not have a changes clause nor any other clause providing for an equitable adjustment of claims of the contractor. No such adjustment can be made in this fixed-price contract for plaintiff's extra-contractual performance. *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Crown Coat Front Co. v. United States*, 386 U.S. 503, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967).

The Board allowed the plaintiff $38,-369.47 of the $227,069 claimed here for the special vestibule training program on the theory that it was due under the terms of the contract. We do not agree. The contract did provide for vestibule training, but in only one division or department, but this was accomplished before USS conducted the special training program.

Not only was the computation of the contractor's compensation explicitly fixed by the contract, the services the contractor was obligated to provide were also explicitly defined. As to vestibule training the contract provided as follows:

2. *Vestibule Training*

Vestibule Training was formerly the life blood of manpower development in industry. This training will simulate on-the-job conditions in a large shop-type area.

The participants will be involved in Vestibule Training for a total of 88 hours. They will attend this class four hours per day for four weeks and two days.

Vestibule training will be designed for the entry level occupation and selected higher-level occupations in each of the ten participating divisions or departments in the mill. The ten units involved will be.

1. Coke Plant
2. Blast Furnaces
3. Steel Producing
4. Central Mills
5. West Mills
6. Hot Rolling
7. Sheet Division
8. Tin Division
9. General Services
10. Mason Department

Each group of trainees will be placed in a vestibule training class being taught the entry-level occupation of *one of the above divisions or departments.* * * * [Emphasis supplied.]

The unit cost of the aforementioned vestibule training was $760.36, assuming 1,872 participants in the program. It is clear that the contract price did not authorize USS to train the recruits to work in more than one division or department, yet that is exactly what it did. The trainees had completed their training in one division or department as authorized by the contract, for which USS had been paid, but USS could not put them to work as regular employees because of the General Motors strike. Rather than lay them off, USS gave them additional training in another division or department. This was clearly in addition to what was authorized by the contract and was outside of and beyond its provisions. Besides, it was clearly for the benefit of USS because the trainees would be more useful to USS when hired on a permanent basis.

1. For a discussion of the difference between a contract implied in fact and one implied in law, see *Algonac* 428 F.2d at 1255–56, 192 Ct.Cl. at 673–74.

Even after the Board had decided $38,-369.47 of the special training program could be allowed as due under the contract, the plaintiff apparently did not agree, because thereafter it filed suit here for the entire $227,069 on a quantum meruit quasi contract basis, alleging in its petition:

30. In late September USS determined to give certain individuals *who had completed the 12-week training program—additional training* so that they would be qualified for jobs in sections of the mill which were not affected by the GM strike and so that they would not be laid off and lose faith in the program.

31. USS thus gave these individuals some 78,706.6 *additional* hours of training.

32. Individuals receiving the *additional training* were paid at the rate of $2.885 per hour which meant that USS incurred an additional $227,069 in wage payments *which were not contemplated under the contract and not included in the contract price.* [Emphasis supplied.]

Furthermore, in plaintiff's motion for summary judgment it stated:

\* \* \* The wage payments made to each trainee for each *additional* day of training *were not contemplated by the contract and not included in the* \* \* \* *fixed unit cost.* They represented a straight out of the pocket expenditure by U. S. Steel.

\* \* \* \* \* \*

\* \* \* Accordingly, U. S. Steel is entitled to recover the costs of the special training program *under the doctrine of quasi-contract.* [Emphasis supplied.]

Of course, the Board did not have the benefit of these allegations in plaintiff's petition filed in this court following the Board's decision. The Board was no doubt influenced by a letter from Assistant Secretary of Labor for Manpower, Malcolm R. Lovell, Jr., dated May 1, 1972, long after the completion of the contract, which stated among other things:

\* \* \* Therefore, the Manpower Administration *could entertain* an additional invoice of $38,369.47 (78,706.6 x $0.4875). [Emphasis supplied.]

This letter was a gratuitous statement made after the completion of the contract and was entirely without consideration. If it had any effect, it was an offer to compromise the claim, which was not accepted. The letter did not modify or change the executed contract under the disputes clause.

The Board allowed the $38,369.47 as being within the terms of the contract, because the additional training benefited the trainees and the Government and represented services rendered to accomplish the purpose of the contract.

This decision of the Board was an erroneous interpretation of the contract, which is a question of law, and we are not bound by its decision. The Board apparently lost sight of the fact that the contract was a fixed-price contract that contained specific provisions governing the rights and duties of the parties. As stated above, there was no changes clause or other clause in the contract providing for any kind of an equitable adjustment for the contractor. Under these circumstances, the only way the Government could pay USS for the additional training program outside of the contract would have been for the contracting officer to have modified or changed the contract. The contract was never changed nor modified in this regard.

▌ Plaintiff now contends that the defendant cannot contest the Board's award to it of the $38,369.47 because of the decision in *S & E Contractors, Inc. v. United States,* 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). We do not agree. In the first place USS has not agreed to accept the $38,369.47 in full settlement of its claim of $227,069 for the special training program. In this suit it seeks to collect the entire $227,069 of which $38,369.47 is a part. By suing here for the balance of the claim, the plaintiff has kept the dispute alive that involves the entire claim. Under these circumstances, the defendant has every right to challenge the award of $38,369.47 made

930

by the Board. This was the effect of our holding in *Roscoe-Ajax Construction Co. v. United States*, 499 F.2d 639, 204 Ct.Cl. 726 (1974). Since the plaintiff has appealed a part of a disputed claim, the defendant has the right to appeal and contest the rest of the same claim.

We conclude that the plaintiff is not entitled to recover on its quantum meruit quasi contract claims of $135,954 for six extra head trainers and $22,069 for the extra basic training of the trainees. We reverse the decision of the Board as to the $38,-369.47 which it awarded to the plaintiff as a part of the claimed $227,069.

The plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment is granted, and plaintiff's petition is dismissed.