**TRAUMA SERVICE GROUP, LTD., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

No. 94–547C.

United States Court of Federal Claims.

May 5, 1995.

Ruth Eileen Ganister, Rosenthal & Ganister, West Chester, PA, for plaintiff.

Mary L. Smith, Dept. of Justice, Civ. Div., Commercial Litigation, Washington, DC, for defendant.

### ORDER

WEINSTEIN, Judge.

Defendant has moved to dismiss the complaint for lack of subject-matter jurisdiction, under RCFC 12(b)(1), or for failure to state a claim, RCFC 12(b)(4). In the alternative, defendant moves for summary judgment.

The grounds alleged for allowing each of defendant's motions are essentially the same—that the Department of Defense's partnership agreement with plaintiff Trauma Service Group, Ltd. (TSG), pursuant to 10 U.S.C. § 1096, was not, as plaintiff claims, a binding contract to pay the salary of an x-ray technician employed by plaintiff.

For purposes of deciding the motions to dismiss, the court has deemed to be true, and viewed in their most positive light, all of the facts pleaded by plaintiff as relevant to the establishment of an oral or implied-in-fact contract within the jurisdiction of the court. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *see also Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (dismissal inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). However, the facts here are not really in dispute. Defendant's motion to dismiss, with prejudice, for failure to state a claim is granted.

### Background

In 1956, Congress established a health plan for dependents of active and certain retired members of the uniformed services, to allow for the provision of uniform medical care by civilian medical facilities for those who could not be cared for in military medical facilities. *See* Dependents' Medical Care Act, Pub.L. 84–569, 70 Stat. 250 (1956) (now codified as amended at 10 U.S.C. §§ 1071–1106) (Act). The Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) executes the Dependents' Medical Care Act, as amended. *See* 10 U.S.C. § 1072(4).

Under the Act, all hospital charges in excess of twenty-five dollars, including surgeons' and physicians' fees and all preoperative and postoperative charges for care, including x-ray and laboratory costs incurred during those periods, are paid directly by CHAMPUS. 10 U.S.C. §§ 1077, 1079. Civilian outpatient care was approved in 1966. *See* Military Medical Benefits Amendments of 1966, Pub.L. 89–614, § 2(4), 80 Stat. 862, 864 (codified at 10 U.S.C. § 1079(b)(2)).

Military treatment facility commanders are authorized to enter into "agreements for the sharing of resources" between "facilities of the uniformed services" and civilian health

care providers, when such an arrangement "result[s] in the delivery of health care to which covered beneficiaries are entitled under this chapter in a more effective, efficient, or economical manner." 10 U.S.C. § 1096(a). These "partnership agreements" authorized by § 1096 "allow[ ] the military treatment facility to achieve maximum use of available facility space, [and] ... result in savings to the Government by using civilian medical specialists to provide inpatient care in Government-owned facilities, thereby avoiding the civilian facility charges which would have otherwise been billed CHAMPUS." 32 C.F.R. § 199.1(p)(1)(ii). *See generally United States v. Custodio,* 39 F.3d 1121, 1122 (10th Cir.1994).

The Secretary of Defense separately contracts with CHAMPUS providers, under other provisions of the Act, *see* §§ 1079, 1086, 1097, to compensate them directly for medical care provided to certain beneficiaries. These provisions differ from § 1096 in that they authorize "contract[s]" with the providers (§ 1096 refers to "agreement[s]"), and because they expressly authorize the Secretary to make payments to the providers for services rendered to CHAMPUS beneficiaries. *See* 10 U.S.C. §§ 1079(h)(1), 1086(h)(1).[1]

On August 20, 1990, plaintiff and Winn Army Community Hospital (the hospital), the military treatment "facility," entered into an "agreement[ ] for the sharing of resources," labelled a Memorandum of Agreement (MOA). The stated purpose of the MOA was "to integrate specific Winn Army Community Hospital and CHAMPUS program resources to provide Primary Care/Pediatric services for CHAMPUS beneficiaries in Winn Army Community Hospital." App. 1.

Under the MOA, plaintiff was required, *inter alia,* to "[m]onitor overall outpatient services that are directly related to the care of patients referred as a part of this agreement except that portion of care rendered by or at the direction of Department of the Army health care providers," App. 3; obtain professional liability insurance; abide by Department of Defense, Department of the Army, and CHAMPUS regulations; and provide a specific number of personnel at all times.[2] Plaintiff agreed to charge patients in that hospital no more than sixty-nine percent of the CHAMPUS prevailing rate. The hospital commander agreed, among other things, to review and approve plaintiff's chosen doctors, and give them access to the hospital and its facilities.

The MOA also provided that neither party could assign its rights under the agreement without the other's written consent, and stated: "Termination of this agreement shall be predicated upon satisfactory written notice to the other party not less than 60 days before the proposed termination date. However, the 60–day notice may be waived by mutual consent of the parties to the agreement or unilaterally for the convenience of government." App. 4.

Plaintiff contends that defendant breached the MOA by making improper use of plaintiff's x-ray technician, specifically, by requiring the technician to work full time on non-CHAMPUS-related inpatient services, and therefore is obligated to pay that employee's full salary. (Plaintiff does not, however, allege that any particular government official expressly contracted in writing or verbally with plaintiff to reimburse TSG for this employee's salary.)

Defendant argues that the MOA is not a binding contract to pay this salary, because: it contains no statement that it is binding; it sets out neither the consequences of a breach nor any method for resolving disputes, including the dispute here over how much of an

---

1. There is no contention that the TSG employee's salary is reimbursable as a payment for services under § 1079, 1086, or 1097.

2. The MOA provides,

 6. [TSG] shall provide the following to support this effort:

 (a) Two physicians, one RN, one LPN, one appointment clerk/receptionist, one billing clerk, Xerox machine, and office supplies during duty hours.

 (b) Three physicians, one each RN, LPN, nursing assistant, appointment clerk/receptionist, billing clerk, pharmacy technician, lab technician, X-ray technician, a Xerox machine, and office supplies during off duty times, weekends, and holidays.

App. 5.

employee's time may be utilized by defendant; and it does not contain any agreement to directly and separately reimburse TSG for the salary of one of its employees, nor any undertaking authorized by §§ 1079(h)(1) or 1086(h)(1), which provide only for payment for direct services to *CHAMPUS beneficiaries*. Thus, the MOA reflects no intent to create any binding obligation to pay the technician's wages; such an obligation was not authorized by law; and thus the MOA is unenforceable.

### The MOA is a cooperative agreement, not a contract

■ Not every agreement is a contract. *Restatement (Second) of Contracts* § 3 cmt. a (1981) ("Agreement has in some respects a wider meaning than contract, bargain or promise.... The word 'agreement' contains no implication that legal consequences are or are not produced.").

■ The Federal Grant and Cooperative Agreement Act (FGCAA), 31 U.S.C. §§ 6301–08, enacted in 1977, sets out three categories. of agreements between federal agencies and other entities: procurement contracts, cooperative agreements, and grant agreements. All federal agreements fall into this scheme, *see* S.Rep. No. 1180, 95th Cong., 2d Sess. 30–31, *reprinted in* 1978 U.S.C.C.A.N. 31, 33–35; *see also In re Civic Action Inst.,* 61 Comp.Gen. 637, 640 (1982) (agreement's purpose, not how it is named in the authorizing statute, determines how it is classified), unless they are expressly excluded, *see, e.g.,* 15 U.S.C. § 3710a(d)(1). *See generally* Comptroller General of the United States, *Agencies Need Better Guidance for Choosing Among Contracts, Grants, and Cooperative Agreements,* GGD–81–88 (Sept. 4, 1981) (GAO Report).

■ That Congress did not intend the partnership agreements authorized under § 1096 to create binding contractual obligations is suggested, first, by the fact that they are expressly denominated "agreements," rather than procurement "contracts." Also, there is no express authority in § 1096 for the government to enter into procurement contracts as such, or to obligate funds to pay for them. *See Federal Crop Ins. Co.*

*v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) (unauthorized contracts are not enforceable against the government).

As the FGCAA provides, Congress may authorize agreements that are not procurement contracts and are not subject to the general statutes, regulations, and requirements governing procurement contracts, *e.g.,* the Competition in Contracting Act, 41 U.S.C. §§ 251 *et seq.;* the Contract Disputes Act, 41 U.S.C. §§ 601 *et seq.;* and the Federal Acquisition Regulations, 48 C.F.R. Chap. 1. The MOA neither incorporates nor references any of these authorities, nor contains the standard labor provisions required in federal contracts, such as those of the Davis–Bacon Act or the Buy American Act. The lack of any reference in the MOA to these statutes or regulations applicable to (and generally mandatory for) federal procurement contracts further establishes that the MOA was not intended to be a contract.

■ Section 4(1) of the FGCAA states that a procurement contract shall be used whenever "the principal purpose of the instrument is to acquire (by purchase, lease or barter) property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6303(1). However, the principal purpose of the MOA, as authorized by § 1096, is mutual assistance in carrying out the purposes of the CHAMPUS program, facilitating the delivery of care to third-party CHAMPUS beneficiaries, and reducing costs for both parties. Thus, the MOA is not primarily for the "direct benefit or use" of the government.

■ A cooperative agreement or assistance agreement is not a contract. *See e.g., Council on Envt'l Quality,* 65 Comp.Gen. 605, 605–07 (1986) (contrasting "cooperative agreement" with "contract" and "contractual relationship"). Rather, "[g]rants and cooperative agreements ... reflect a *relationship* between the United States Government and a ... recipient.... It is customary to refer to both instruments as evidencing 'assistance relationships.' " *Id.* at 606 & n. 2 (emphasis added); *accord, e.g.,* S.Rep. No. 449, 95th Cong., 2d Sess. 6, *reprinted in* 1978 U.S.C.C.A.N. 11, 16.

■ A cooperative agreement is a "form[ ] of assistance," *id.* at 3, *reprinted in* 1978 U.S.C.C.A.N. at 12, and may not be used to bypass legal requirements applicable to contracts. *Chem Serv., Inc. v. Environmental Monitoring Sys. Lab.–Cincinnati,* 12 F.3d 1256, 1266 & n. 11 (3rd Cir.1993); S.Rep. No. 449 at 7, *reprinted in* 1978 U.S.C.C.A.N. at 16.

It should be readily apparent from the foregoing that a CHAMPUS partnership agreement under § 1096, such as this MOA, is an assistance agreement, specifically, a cooperative agreement, not a procurement contract under federal law. This also may be concluded from the purpose and operation of the MOA. *See* 31 U.S.C. § 6305 (cooperative agreements are used when "the principal purpose of the relationship is to transfer a thing of value [ (here, use of federal medical facilities) ] to the ... recipient to carry out a public purpose of support or stimulation authorized by a law of the United States," and "substantial involvement is expected between the executive agency and the ... recipient when carrying out the activity contemplated in the agreement"); *see also Civic Action Inst.,* 61 Comp.Gen. 637, 640 (cooperative agreements are used when "the Government's purpose is to *'assist'* the intermediary in providing goods or services to the authorized recipient," rather than "to *'acquire'* an intermediary's services, which may ultimately be delivered to an authorized recipient"); GAO Report at 52 (procurement contracts and assistance awards have differing requirements, and are subject to different laws, regulations and executive branch governance (OMB circulars); assistance awards are not subject to procurement regulations, "nor is there a cohesive body of regulations covering assistance").

### The MOA is not a binding contract

■ Even if the MOA were a contract and provided for the payment of money, it would not necessarily be a contract enforceable in this court. "The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or compact which can semantically be stated in terms of offer and acceptance or meeting of minds." *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 268 *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).

The MOA, unlike most contracts, sets out no remedy for breach or nonperformance. Rather, it is clear from the MOA that a party's sole remedy for the other's breach, other than to attempt to resolve the problem through informal consultation and negotiations, is simply to terminate the agreement, *cf. Aerolineas Argentinas v. United States,* 31 Fed.Cl. 25, 35–36 & n. 13 (1994), *appeal pending,* No. 94–5076 (Fed.Cir. filed Feb. 23, 1994), as § C.3 of the MOA permits, upon sixty days notice. Eventually, this is what plaintiff did. Supp.App. 5, 6. *See generally Bel Pre Health Care Ctr.,* 24 Cl.Ct. 495, 496 (1991) ("the terms of a contract must 'provide a basis for determining the existence of a breach and for giving an appropriate remedy' " (quoting *Restatement (Second) of Contracts* § 33(2) (1979)), *aff'd without op.,* 980 F.2d 745 (Fed.Cir.1992).

The presence of standard contract provisions, such as non-assignability and termination provisions, does not convert the MOA into a contract. Thus, an agreement between the Veterans Administration and a nursing home for provision of services to veterans was found in *Bel Pre* not to be a contract, despite termination and default clauses, where the contract set out no minimum number of patients or length of stay. *Id.* at 498.

The absence of any definitive terms evidencing the government's intent to be presently bound, or setting out the consequences of a breach also characterized the agreement that was found not to be independently enforceable by the court in *Modern Systems Technology Corp. v. United States,* 979 F.2d 200, 201 (Fed.Cir.1992). That agreement, a Basic Pricing Agreement (BPA) between the plaintiff and the Postal Service for telephone repairs over a two-year period, stated a maximum that could be billed to the Postal Service, but provided, "The Postal Service is obligated only to the extent of individual orders actually placed under this agreement. Each order that the Postal Service places

and the contractor accepts becomes an individual contract."

The Federal Circuit held that plaintiff's suit for the contractual maximum, when no orders had been placed by the Postal Service, was barred, because the BPA merely established terms and conditions for future contracts, but "itself does not create any enforceable obligations between either party. Only accepted orders would create any obligations.... The plain language of the BPA, thus, appears to be contemplative of future contracts. There is no language indicating any present intent that either party be bound." *Id.* at 202.

The *Modern Systems* court also concluded that the BPA was not a contract because (like the MOA here) it could not be determined whether a breach had occurred: "Without a minimum quantity provision, the BPA does not provide the court any guidance as to how to determine if and when a breach has occurred. Therefore, the BPA does not rise to the level of a binding contract and must fail for indefiniteness." *Id.* at 206; *see also, e.g., Evans v. United States,* 42 Ct.Cl. 287, 298, 1907 WL 902 (1907) (government offer of (free) tugboat assistance, which was

accepted by subcontractor to hasten delivery to contractor, was *nudum pactum,* and no contract arose between government and subcontractor).[3]

### *The MOA is unauthorized, and thus unenforceable*

Suit may not be brought in this court on a contract unless "[t]he claimant for money damages for breach of an express or implied in fact contract ... show[s] that the officer who supposedly made the contract had authority to obligate appropriated funds." *Kania,* 650 F.2d at 268; *see Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. at 3; 31 U.S.C. § 1341(a)(1); *see also City of El Centro v. United States,* 922 F.2d 816, 820–23 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). *See generally, e.g., Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 508 F.2d 817, 822 (1974).

No contract, express or implied in fact, arises upon the government's mere acceptance of benefits, absent affirmative authority of the contracting officer to so bind the government.[4] *See Merritt v. United*

---

**3.** The agreement found to be contractually binding in *Town of North Bonneville, Washington v. United States,* 5 Cl.Ct. 312 (1984), *aff'd in part and rev'd in part without op.,* 833 F.2d 1024 (Fed.Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988), relied upon by plaintiff, unlike the MOA here, included standard provisions of government contracts, and stated that it was binding. *Id.* at 322–23. In addition, the legislation authorizing the contract referred to it as a "binding contractual commitment[]." *Id.* at 319. The decision in *State of Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 859 (1978), where the court allowed recovery when the government—the Bureau of Prisons—expressly agreed to provide labor in a cooperative agreement with the State, also is distinguishable, for the government there conceded the question at issue here—the existence of an express contract. Also, the question of whether such a concession—if incorrect—could vest jurisdiction in the court was not raised. *See, e.g., Gately v. Commonwealth of Mass.,* 2 F.3d 1221, 1226 (1st Cir.1993) (an issue not discussed does not constitute a precedent to be followed), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); *see also Brown Shoe Co. v. United States* 370 U.S. 294, 306–08 & n. 14, 82 S.Ct. 1502, 1513–14 & n. 14, 8 L.Ed.2d 510 (1962); *Huston v. United States* 956 F.2d 259,

261 (Fed.Cir.1992) (court's exercise of jurisdiction without discussing whether jurisdiction exists is not binding as to whether jurisdiction is proper).

**4.** The decision in *United States v. Amdahl Corp.,* 786 F.2d 387, 393–94 (Fed.Cir.1986), that a contractor may recover on a quantum merit basis for goods or services received by the government under an unauthorized (and thus void or voidable) contract before its rescission, and consistent prior precedent, are distinguishable, for the government never treated the MOA as a contract. Also, they appear to have been overruled by the Supreme Court's rejection of promissory estoppel in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990). ("If agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the [Appropriations] Clause reposes in Congress in effect could be transferred to the Executive.... in violation of the Constitution."). *See Gould, Inc. v. United States,* 29 Fed.Cl. 758, 762 (1993). Even if promissory estoppel were viable here because there is no conflict with statutory criteria for payment of services to CHAMPUS providers, the four elements for recovery based on this theory—

*States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). *See also New Am. Shipbuilders, Inc. v. United States,* 871 F.2d 1077 (Fed.Cir.) (general rule is that "those who deal with the government are expected to know the law and may not rely on the conduct of Government agents contrary to the law); *United States Steel Corp. v. United States,* 210 Ct.Cl. 228, 536 F.2d 921, 926–27 (1976).

 Claims for unjust enrichment on quantum merit damages state claims for breaches of contracts implied in law, over which the court has no jurisdiction. *See, e.g., Atlas Corp. v. United States,* 895 F.2d 745, 755 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *see also United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *United States v. Minnesota Mutual Co. Inc.,* 271 U.S. 212, 217, 46 S.Ct. 501, 502, 70 L.Ed. 911 (1926). The Tucker Act does not give this court jurisdiction over a contract implied in law (*i.e.,* a contract where there is no actual meeting of the minds, arising solely by operation of law). *Merritt v. United States,* 267 U.S. at 340–41, 45 S.Ct. at 279; *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289, 296–97 (1982). Also, there can be no implied contract between the parties when an express contract covers the same subject. *See Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 428 F.2d 1241, 1255 (1970).

Plaintiff has provided absolutely no evidence that any government employee or employees was authorized to enter into a contract, express or implied, for the payment of money to plaintiff for the salary of plaintiff's x-ray technician or for full-time work for the government. Even if someone agreed to such an arrangement, plaintiff points to no statutory authority for the government to pay that employee's salary. Nothing in the statute, *see* 10 U.S.C. § 1096; nor its legislative history, *see* H.R.Conf.Rep. No. 1001, 99th Cong., 2d Sess. 489, *reprinted in* 1986 U.S.C.C.A.N. 6529, 6548; S.Rep. No. 331, 99th Cong.2d Sess. 244, *reprinted in* 1986 U.S.C.C.A.N. 6413, 6439; nor the regulations thereunder, *see* 32 C.F.R. § 199.1(p); Department of Defense Instruction 6010.12, authorizes any contract requiring expenditures of appropriated funds for the payment of personal services pursuant solely to a CHAMPUS partnership agreement under § 1096. *Cf. Federal Crop Ins. Corp. v. Merrill,* 332 U.S. at 384, 68 S.Ct. at 2 ("anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that ... Government [representative] stays within the bounds of his authority").

Personal services contracts with CHAMPUS health care providers are authorized, instead, by § 1091. The MOA here, even if authorized by § 1091, clearly was not entered into pursuant to § 1091, since § 1091 requires competition in the award of such contract, *see* 10 U.S.C. § 1091(c), yet no competitive bids preceded the execution of the MOA. As the court held in *Modern Systems Technology,* 979 F.2d at 201, no binding agreement arises, if at all, until an independent, express, and authorized contract is made, under separate authority (in *Modern Systems,* an individual order; in this case, an agreement under § 1091).

*Plaintiff's claim is tortious, not contractual*

 Finally, plaintiff's contention here—that defendant acted improperly by demanding that the technician be provided to the inpatient facilities of the hospital on a full-time basis in support of the hospital's own inpatient care services and reporting to defendant's hospital personnel—essentially states a claim in tort, not in contract, since it is grounded upon alleged misconduct by a government employee, *e.g.,* conversion, threats, or tortious interference with plaintiff's own employment contract with the technician. *See Britt v. Whitmire,* 956 F.2d 509, 513 (5th Cir.1992) (court looks to substance of claim, not form); *BBCA, Inc. v. United States,* 954 F.2d 1429, 1431–32 (8th Cir.),

that (1) the government know the true facts, (2) the government intend that its conduct be acted on, (3) the contractor be ignorant of the true facts, and (4) the contractor rely on the government's conduct to its detriment—are not present,

in that it appears that TSG was never misled or ignorant regarding any relevant *facts. See JANA, Inc. v. United States,* 936 F.2d 1265, 1270 (Fed. Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992).

*cert. denied,* —— U.S. ——, 113 S.Ct. 192, 121 L.Ed.2d 136 (1992).

 As the Tucker Act, 28 U.S.C. § 1491, makes clear, this court has no jurisdiction over claims sounding in tort. *See United States v. Nederlandsch–Amerikaansche Stoomvart Maatschappij (Holland–American Line),* 254 U.S. 148, 153–55, 41 S.Ct. 72, 73–74, 65 L.Ed. 193 (1920) (substance of claim, showing that it rested upon payments alleged to have been made by petitioner under duress because of the threats and wrongful acts of government officials, found to be tort, to which government did not subject itself to liability under the Tucker Act); *Schillinger v. United States,* 155 U.S. 163, 167–68, 15 S.Ct. 85, 86, 39 L.Ed. 108 (1894); *Gibbons v. United States,* 75 U.S. (8 Wall) 269, 275, 19 L.Ed. 453 (1868); *Huerta v. United States,* 212 Ct.Cl. 473, 548 F.2d 343, 348 (allegation of unlawful acts by government personnel states action in tort), *cert. denied,* 434 U.S. 828, 98 S.Ct. 108, 54 L.Ed.2d 88 (1977).

*Conclusion*

 For the reasons stated above, defendant's motion to dismiss is granted. The Clerk is ordered to dismiss the complaint, without prejudice.[5]

---

5. *See Spruill v. MSPB,* 978 F.2d 679, 686–87 (Fed.Cir.1992) (in a court of limited statutory jurisdiction failure to state a claim may become confused with lack of subject matter jurisdiction) (citing *Montana–Dakota Util. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951); *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); *Do–Well Machine Shop v. United States,* 870 F.2d 637, 639–40 (Fed.Cir.1989)). To determine whether a claim is well-founded, the court must take (and therefore have) subject-matter jurisdiction. The uniform practice, however, when both deficiencies exist, and the jurisdictional facts are intertwined with the elements of the claim, and the claim is not made solely for the purpose of acquiring jurisdiction, nor frivolous, is to assume jurisdiction and decide the case by summary judgment or trial, *i.e.,* on the merits. *Bell v. Hood,* 327 U.S. 678, 681–83, 66 S.Ct. 773, 775–76, 90 L.Ed. 939 (1946).

The practical consequences of either dismissal, in this case, appear the same. Since a decision

that subject-matter jurisdiction is lacking is the law of the case on the jurisdictional issue, although not *res judicata* on the merits, the claim cannot be brought again in this court on the same jurisdictional facts, even if the dismissal is without prejudice. If the jurisdiction of another court having different jurisdictional powers subsequently is invoked (*e.g.,* a federal district court's tort jurisdiction), the jurisdictional decision here would not be binding on (or relevant to) that court's decision regarding its own jurisdiction. Even if this court reaches the merits and dismisses the contract claim for failure to state a claim, *i.e., with* prejudice, such a dismissal would not bar that court's consideration of a *different claim* (*i.e.,* a tort claim), having different elements of proof.

